# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-3121

IN RE:

  UAL CORPORATION, *et al.*,

                                                    *Debtors.*

UNITED RETIRED PILOTS BENEFIT
PROTECTION ASSOCIATION, *et al.*,

                                                    *Appellants,*

                        *v.*

UNITED AIRLINES, INC., *et al.*,

                                                    *Debtors-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 1202—**John W. Darrah**, *Judge.*

_____

ARGUED FEBRUARY 24, 2006—DECIDED MARCH 31, 2006
_____

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* In the course of United Airlines' bankruptcy, the bankruptcy judge, seconded by the district judge, allowed United to eliminate the contractual pension rights of its 3,000 or so retired pilots without a hearing to determine whether they should receive "replacement" benefits (compensation for giving up those rights),

which United had given its active pilots. The association representing the retired pilots has appealed. (The "*et al.*" parties on both sides of the case can be ignored.) Recently United emerged from bankruptcy, and it argues that this renders the appeal moot. That is incorrect. All that the retired pilots are seeking in the first instance is a hearing before the bankruptcy judge, and we shall see that the judge could at that hearing deny any relief that would jeopardize United's newly recovered solvency. And there is no argument that the confirmed plan resolves the claims made by the retired pilots in this appeal.

United had a (frequently amended) collective bargaining agreement with the Air Line Pilots Association (ALPA) that among other things established defined-benefit pension plans for both active and retired pilots employed by United. The plans provided both tax-qualified and non-tax-qualified pension benefits; the distinctions relevant to this case are that the latter are not insured by the Pension Benefit Guaranty Corporation or protected by the provisions of ERISA relating to the termination of pension plans. 29 U.S.C. §§ 1321(a), (b)(8).

Normally a bankruptcy trustee, or as in this case a debtor in possession, can freely reject the executory portion of a contract. But section 1113 of the Bankruptcy Code permits the rejection of the executory portion of a collective bargaining agreement only with the approval of the bankruptcy judge after negotiations looking to mutually satisfactory modifications of the agreement, 11 U.S.C. § 1113(b)(2), and only if (the negotiations failing) the judge determines that "the balance of the equities clearly favors rejection of such agreement." § 1113(c)(3). Wanting to lift the albatross of pension obligations from its shoulders as well as to reduce the pilots' wages, United filed an

application under section 1113 for rejection of the collective bargaining agreement and proceeded to the negotiation phase with ALPA. When ALPA made clear that it would not represent the interests of the retired pilots in the negotiations, the latter moved the bankruptcy judge to appoint a representative to participate in the negotiations on their behalf. The purpose of the motion is a little obscure. The retired pilots already had a representative—the United Retired Pilots Benefit Protection Association, the appellant. What they really wanted was for the judge to order United and ALPA to negotiate with URPBPA as well. The judge refused, and as a result the retired pilots did not participate in the negotiations. The judge's refusal is one of the orders that the association is asking us to reverse.

While the section 1113 proceeding was going on, United and ALPA negotiated an agreement (the parties call this the "Letter Agreement") to modify the collective bargaining agreement. The modification was intended to eliminate the pension plans created by the agreement but compensate the active pilots, that is, the pilots represented by ALPA, by giving them convertible notes valued at $550 million and other consideration, including a defined-contribution pension plan. In exchange for these concessions ALPA agreed not to oppose United's attempt to terminate the collectively bargained pension plans under 29 U.S.C. § 1341, the provision of ERISA that governs the voluntary termination of pension plans.

With the agreement to modify the collective bargaining agreement, United's application under section 1113 to reject the agreement entered a state of suspended animation, since the modification of the collective bargaining agreement by the Letter Agreement would, if that agreement was

approved, give United the relief it wanted without its having to persuade the bankruptcy judge to reject the collective bargaining agreement.

United asked the bankruptcy judge to approve the Letter Agreement under 11 U.S.C. § 363(b)(1), which requires that the bankruptcy judge's approval be obtained for contracts made by the debtor during the bankruptcy that are outside the ordinary course of business, as the Letter Agreement obviously was. The judge gave his approval, and this is the other order challenged on this appeal. The retired pilots argue that he shouldn't have approved the agreement without giving them a chance to participate in the negotiations for replacement benefits; such participation might, they argue, have resulted in their receiving replacement benefits too.

The order of approval extinguished any rights that the retired pilots might have had under the collective bargaining agreement. It was the equivalent of a final judgment in a suit for breach of contract, and therefore appealable as a severable phase of the bankruptcy proceeding. *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 944 (7th Cir. 2003). The earlier order refusing to appoint a representative to negotiate with United and ALPA on the retired pilots' behalf over replacement benefits to compensate for the modification of the collective bargaining agreement was interlocutory, but interlocutory to the order extinguishing their contract rights and therefore reviewable by us with it.

After the bankruptcy judge approved the Letter Agreement, United withdrew its section 1113 motion for rejection of the collective bargaining agreement. The approval did not, however, terminate the pension plans. For that to happen an application had to be made to and approved by

the bankruptcy judge under one of two sections of ERISA. Under the first, 29 U.S.C. § 1341 (voluntary termination), the employer asks for termination. Under the second, 29 U.S.C. § 1342 (involuntary termination), the Pension Benefit Guaranty Corporation, which insures vested rights under ERISA pension plans, 29 U.S.C. § 1322(a); *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 637-38 (1990), asks. United started down the voluntary-termination road, as we know, but withdrew when the PBGC applied for involuntary termination. The PBGC anticipated that if the pension plans were not terminated, and so continued generating new vested pension rights, the plans would go into default and as the insurer of those rights the PBGC would face a staggering liability.

The bankruptcy judge granted the PBGC's application in an order that is currently on appeal to the district court. Assuming the order is upheld, the PBGC will become the obligor of the retired pilots' vested pension rights, though only to a limited extent. Although airline pilots must retire at the age of 60, the PBGC does not begin to pay full benefits until the retiree reaches the age of 65. Also, as we noted earlier, it does not replace any non-tax-qualified benefits. And it pays a maximum of $44,388 in benefits to participants in plans terminated, as this one was, in 2004. What is more, while the benefits that PBGC will be paying the active pilots when they retire will be on top of the replacement benefits that United has given them in exchange for the surrender of their rights under the pension plans, the retirees have received no replacement benefits. They do have unsecured claims arising from their contractual pension rights, to the extent they're not compensated by the PBGC insurance, but according to the parties the value of those claims has not yet been determined by the bankruptcy court. (That's a puzzle; the retired pilots have debt claims

and debt is converted to stock in United's plan of reorganization and it isn't possible to confirm the plan without knowing who gets how much stock. But it not a puzzle we need to unravel in order to decide this appeal.) Nor do we know what fraction of the claims will actually be paid. All that is clear is that the retired pilots have *some* financial stake in pursuing this litigation.

In the negotiations leading up to the Letter Agreement, the active pilots, represented by ALPA, received as we know sizable compensation for surrendering their right to fight for their pension rights. The retired employees were bound to receive less. They lost less; a retired pilot will have enjoyed the benefit of full pension payments since his retirement, while an active pilot who is near retirement will have been contributing to the pension plan for many years without receiving any benefits. More important, the active pilots had a stick to use against United—the threat of a strike—that the retirees didn't have. But the retired pilots received not merely lower replacement benefits than the active pilots; they received nothing—and with no opportunity to negotiate for something.

United defends this result primarily on the ground that two parties to a contract are always free to modify it without considering the views of any third parties. United and ALPA are the only parties to the collective bargaining agreement, and a union's duty to bargain collectively on behalf of the members of the bargaining unit that the union represents does not extend to retired workers, because they are not members of the unit. *Allied Chemical & Alkali Workers of America*, *Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 182 n. 20 (1971). The retirees do not argue that they are third-party beneficiaries of the collective bargaining agreement. The argument would be unlikely to prevail,

which may be why it hasn't been made. The test for whether someone is a third-party beneficiary is whether the express parties to the contract intended the third party to have the right to enforce the contract. *A.E.I. Music Network, Inc. v. Business Computers, Inc.,* 290 F.3d 952, 955 (7th Cir. 2002); *Vidimos, Inc. v. Laser Lab Ltd.,* 99 F.3d 217, 219-20 (7th Cir. 1996). Generally, the test is deemed satisfied if a member of the bargaining unit seeks to enforce the collective bargaining agreement. E.g., *United Food & Commercial Workers Local 951 v. Mulder,* 31 F.3d 365, 370 (6th Cir. 1994). It is satisfied if the beneficiary under a welfare plan established by a collective bargaining agreement sues for benefits. *Hazen v. Western Union Tel. Co.,* 518 F.2d 766, 767-70 (6th Cir. 1975). But neither employer nor union would want to create a situation in which retirees, whose interests diverge from those of the active employees, would be able to block modification of the collective bargaining agreement.

ALPA adds, rather unhelpfully, that the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.,* which governs labor relations in the airline industry as well as the railroad industry, does not permit an employer to engage in collective bargaining with any entity other than the union that represents its employees. 45 U.S.C. §§ 152 Fourth, Seventh. That rule would not prevent the employer from negotiating with retirees, who are no longer members of the bargaining unit, if the retirees could derail or impede the negotiations between the parties to modify the collective bargaining agreement. An agreement to modify or abrogate a collective bargaining agreement doesn't affect tax-qualified pension rights created by the agreement until those rights are terminated by a separate order under ERISA. United needed that order for its negotiations with ALPA to give it what it ultimately wanted, namely the termination of the pension plans.

The plans have been terminated, as we said, subject to appeal. The retired pilots are not complaining about the termination in this appeal but about being cut out of an opportunity to obtain replacement benefits, as the active pilots were able to do by virtue of their representation by ALPA, in the negotiations that resulted in the Letter Agreement that the judge approved under 11 U.S.C. § 363(b)(1). The question presented by the retired pilots' appeal boils down to whether the bankruptcy judge could approve that agreement without giving any consideration to the retired pilots' interests.

What interests? More precisely, what *legally protected* interests? United points out that only "interested parties" may participate in a hearing on the debtor's proposal to reject a collective bargaining agreement, 11 U.S.C. § 1113(d)(1), and we have held that "interested parties" include only the parties to (or a guarantor of) the agreement. *In re UAL Corp. (IFS)*, 408 F.3d 847, 851 (7th Cir. 2005). It is true that *In re Century Brass Products, Inc.*, 795 F.2d 265, 274-76 (2d Cir. 1986), had held that retirees are "employees" within the meaning of section 1113(b), and so are entitled to be consulted about the proposal that the employer is required to make as a preliminary to moving the bankruptcy judge to reject the collective bargaining agreement. But *Century Brass* had not discussed whether the retirees were interested parties under section 1113(d), entitling them to oppose the rejection of the agreement, which was the subsection in question in *IFS*. At most, *Century Brass* injects some uncertainty concerning the retired pilots' rights in a section 1113 proceeding, and we shall see that despite the abandonment of that proceeding by United this uncertainty could have a bearing on our decision. For the moment, however, the only relevant point is that United's argument

puts the cart before the horse. There was no section 1113 hearing.

United notes that section 1114, which governs give-ups of medical benefits, expressly requires the appointment of a representative for the beneficiaries in negotiations for such give-ups (corresponding to the pre-rejection negotiations under section 1113). This implies, United argues, that no representative need be appointed for section 1113 negotiations. The argument is unpersuasive. In enacting section 1114, Congress was reacting to a particular issue, that of termination of medical benefits, in a particular bankruptcy, that of the LTV corporation. Susan J. Stabile, "Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code," 14 *Cardozo L. Rev.* 1911, 1926-27 (1993). There is no indication that Congress was specifying or disallowing procedures to be used in section 1113 proceedings. In any event, the question presented by this appeal is not the procedures required by section 1113, since no order was ever issued under that section. It is what negotiating rights if any the retired pilots should have had with regard to the agreement that the bankruptcy judge approved under section 363(b)(1), an agreement that confirmed the receipt of replacement benefits by the active pilots and the receipt of nothing by the retired ones.

Normally, as we said, the parties to a contract can modify it freely without regard to the impact on the financial interests of third parties who are not third-party beneficiaries. But the setting here is abnormal. The modification of the collective bargaining agreement had to be approved by the bankruptcy judge under section 363(b)(1) because it involved payment from the debtor's estate (the replacement benefits) other than in the ordinary course of the debtor's

business. *In re Kmart Corp.*, 359 F.3d 866, 872 (7th Cir. 2004). The reason for the requirement of obtaining judicial approval in such a case is that contracts made by a debtor in bankruptcy that are not in the ordinary course may have an impact on the other creditors in the bankruptcy proceeding. *United States v. Goodstein*, 883 F.2d 1362, 1367 (7th Cir. 1989); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 (3d Cir. 1986); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir. 1986). The criteria for approval, therefore, are whether the transaction makes good business sense, in which event the creditors as a whole should benefit, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991), and whether it preserves the priorities among the creditors. *In re Kmart Corp.*, *supra*, 359 F.3d at 872-73.

United argues that allowing the retired pilots into the negotiations that resulted in the Letter Agreement that the bankruptcy judge approved could not have increased the value of the estate because the retired pilots have no right to enforce the collective bargaining agreement. Which is true, but does not carry quite as far as United thinks. Remember that the Letter Agreement provided that ALPA would not oppose United's effort to terminate the pension plans. Well, the retired pilots could oppose too, though probably not in a section 1113 proceeding (that is the uncertainty we mentioned earlier). The pension plans could be terminated only by proceedings under 29 U.S.C. §§ 1341 or 1342, and the retired pilots both participated in and argued against the PBGC's application for involuntary termination of the pension plans under 29 U.S.C. § 1342. They lost—maybe; the case is on appeal. Surrendering the right to oppose, which doubtless they, like the active pilots, would have done in exchange for replacement benefits (better the bird in the hand), might have been worth something to the debtor's estate, for example if it had headed off the appeal from

termination now pending in the district court, with the possibility of a further appeal to this court (and beyond).

Had United thought the retired pilots worth buying off, it would have offered them something for a "no fight" clause similar to the one in the Letter Agreement. The fact that United did not do this is evidence that the retired pilots had nothing to "sell." But it is not conclusive evidence. Section 363(b)(1)'s requirement that the debtor obtain judicial approval of agreements that are outside the ordinary course of business signifies a degree of congressional distrust of the contractual process in bankruptcy. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). The fear is that the debtor who steps out of the ordinary course of business may be harming creditors as a whole or favoring one creditor over the others without a valid ground. But the criteria for approval—whether the transaction makes good business sense and does not disturb the creditors' rights *inter se*—do not argue compellingly for requiring the debtor to negotiate with creditors seeking special consideration just because they may be in a position to throw a monkey wrench into a transaction otherwise highly advantageous to the debtor and the creditors as a whole.

The fact that United is warning us that the retired pilots are threatening to derail the reorganization and plunge United back into bankruptcy is hardly evidence that getting the retired pilots "on board" the Letter Agreement might indeed have been in the best interests of the estate; it is forensic advocacy; it is the argument we would expect to be made any time someone claimed compensation for not having tried to derail the bankruptcy proceeding. But what is true is that the already daunting complexity of major corporate bankruptcies would be multiplied if anyone with some potential blocking power, yet whom the trustee or debtor in possession had not thought it worthwhile

trying to pay to buy peace with, could insist on negotiating rights as a condition of the bankruptcy judge's approving a transaction out of the ordinary course.

Even if, despite what we have just said, the bankruptcy judge should have conditioned approval of the section 363(b)(1) agreement on the retired pilots' being made negotiating partners with United and the union, there is no longer any feasible remedy that a court could order. To avoid the unraveling of the section 1342 proceeding and perhaps of the entire bankruptcy (though that seems unlikely), we would not order the Letter Agreement vacated. That would be a "logical" remedy but unnecessarily disruptive. All we could do would be to direct the bankruptcy judge on remand to determine what he would have insisted that the retired pilots receive in the agreement, as a condition of his approving it, had he realized they had the same kind of interest as the active pilots, namely the interest conferred by a right to mount an opposition to the termination of the pension plans. But there would be no objective basis for calculating the value that such a right would command in a hypothetical negotiation.

We conclude that the denial of relief to the retired pilots should be, and it is,

AFFIRMED.

No. 05-3121                                                    13

A true Copy:

     Teste:

                                  _____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*