No. 2-09-0103       Filed:  3-15-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | |
|---|---|
| HENRY HAAKE, SANDRA L. ANDERSON, )<br>WILLIAM BEGGS, BLAISE B. BLASKO, )<br>JAMES BOYER, MARY KAY )<br>BRANDIMORE, PAMELA M. BROWN, )<br>BONITA FAYE BUMA, SUZANNE BURKE, )<br>SHARON A. CASE, JOHN CEBULA, )<br>DOUGLAS A. CLARK, ALAN )<br>COPPERSMITH, JAMES CORSO, JAMES )<br>B. COVERT, KATHERINE COYNER, )<br>DENNIS P. CREED, JR., LARRY )<br>DHAMERS, NORA JEAN DICKINSON, )<br>MARTIN J. DONNELLY, PAULA R. )<br>DRENDEL, ROSEMARY EFFINGER, GAIL )<br>ELLENBAUM, DENNIS ERFORD, DALE )<br>EVANS, SUSAN J. FILIPPO, CECILLE )<br>GERBER, GEORGE GLEICH, DEBRA K. )<br>HALBERG, LOUISE HAMMOND, )<br>WILLIAM J. HEARN, RANDAL J. HENDEE, )<br>CAROL HORAN, SCOTT ILIFF, DEBRA C. )<br>JACOBS, STEVEN M. JACOBS, MARY )<br>ANNE JAGNOW, STEPHEN B. JEFFREY, )<br>DALE JANSEN, CHERYL JOHNSON, SETH )<br>PAUL JOHNSON, JOSEPH A. JORDAN, )<br>DIANE KARROW, ROSS KELLAN, )<br>STEPHEN KENNY, GAIL KESSLER, )<br>JAMES KEVIL, JULIE A. KINGSNORTH, )<br>MARY M. KITUN, RAYMOND J. KLEIN, )<br>ROBERTA KMIEC, THOMAS LOWELL )<br>KNUTSON, MARTHA KREMA, MICHAEL )<br>C. KRUEGER, RICHARD J. KRUEGER, )<br>CELIA LAZARSKI, JEFFREY A. LEVIN, )<br>SUSAN F. LEVY-CREED, PHILLIP L. )<br>LINDHORN, ELLEN JO LJUNG, DAVID R. )<br>LOHRKE, KEITH ELBERT MANNING, )<br>SUZANNE HILL McCAFFERTY, JAMES ) | Appeal from the Circuit Court<br>of Du Page County. |

No. 2--09--0103

| | |
|---|---|
| McKINNEY, GLENN R. MESSMER, DOROTHY MIKUSKA, MARY S. MILLER, ROBERT L. MILLER, KENNETH E. MILLS, DIANA D. MITCHELL, MARIBETH MOHAN, LINDA RAE MORGAN, DONNA MORINEC, LAWRENCE W. MROCZEK, THOMAS MURRAY, ELLEN O. NICK, DUAYNE NYCKEL, JEROME R. NYCKEL, SUZANNE PARISEAU, SHARON POPPLETON, KAREN L. RAPP, LINDA RESSER, NANCY ROESNER, NANCY K. RUHLOW, THOMAS J. SALERNO, ROBERT SCHREIBER, BARBARA E. SCHWEIG, RUTH ANN SENEY, DAWN Y. SERRITELLA, SANDRA SHERWIN, MICHAEL SLIVA, HOWARD SOKOL, MAUREEN SPIEGEL, RUSS SUMKA, CASSANDRA A. TAMBURRINO, GAIL TANZER, JERILYN A. TATJE, SUNNE THOMAS, FRANCES K. THOMPSEN, CHARLES TROJAN, LAWRENCE R. VIVERITO, WILLIAM J. VOVES, WILLIAM J. WADINGTON, JANE ANN WILLARD, FRANK R. ZABILKA, RALPH ZAFFINO, and JOAN P. ZAFRANI, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs-Appellees, | ) ) |
| v. | ) No. 07--L--753 |
| | ) |
| THE BOARD OF EDUCATION FOR TOWNSHIP HIGH SCHOOL GLENBARD DISTRICT 87, | ) ) ) ) Honorable ) Stephen J. Culliton, |
| Defendant-Appellant. | ) Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

This case presents the question of whether a school board can decrease the health insurance benefits provided to retirees under certain collective bargaining agreements, after the expiration of those agreements. On January 22, 2009, the trial court entered judgment in favor of the plaintiffs

-2-

here (all retired teachers) on that issue. The school board appeals, raising various arguments that the collective bargaining agreements did not grant retiree benefits that survived the expiration of those agreements, or else that the agreements were validly modified by later agreements, at least as to some of the plaintiffs, and that some of the plaintiffs do not qualify for the benefits in any case. We affirm.

FACTUAL BACKGROUND

The plaintiffs are a group of 107 retired teachers formerly employed by the defendant, the Board of Education for Glenbard Township High School District 87. All of the plaintiffs retired between the spring of 1994 and June 2007. Throughout the plaintiffs' employment, their terms of employment were governed by various collective bargaining agreements (contracts) reached between the defendant and the teachers' union, the Glenbard Education Association (GEA).

The first such contract that is relevant to this action is the 1991 contract, which went into effect in August 1991 and, as extended by the 1993-95 contract, expired in August 1995. Several of the plaintiffs retired in the spring of 1994, while this contract was in force. The next contract was the 1995 contract, which ran from 1995 through 1998, but none of the plaintiffs retired while it was in force. The next relevant contract is the 1998 contract, which ran from 1998 through 2001. It was succeeded by the 2001 contract, which ran from 2001 through 2005. We refer to the 1991 contract, 1998 contract, and 2001 contract collectively herein as "the Earlier Contracts."

The 1991 contract and 1998 contract both contained provisions in section 9.05, labeled "Early Retirement Plan," which included the following:

"9.05 Early Retirement Plan

9.05.01 Prior to reaching age sixty (60), teachers may elect to participate in the Early Retirement Plan. To be eligible, an individual must have completed at least

fifteen (15) years of full-time employment in the District preceding his/her retirement benefits under the provisions of the Illinois Teachers' Retirement Act and this section.

9.05.02 July 1 through June 30 shall be considered to be the Early Retirement Plan year.

9.05.03 Individuals desiring to participate in the Plan shall notify the Superintendent in writing of their intention to retire and desire to participate in the Plan during the following school year on or before January 1 of the year prior to retirement. All applicants who apply for early retirement shall be bound by their decision to participate in the Plan and may not unilaterally withdraw from the Plan after March 1.

9.05.04 While on the Illinois Teachers' Retirement System Early Retirement Plan, the participants may continue to participate in the group insurance programs subject to the insurance carrier's provisions. The Board shall pay the full cost of the group insurance programs for an individual prior to age sixty-five (65), approved as a participant in the Early Retirement Plan which provides the same level of benefits for single or family coverage as when the individual was last teaching and was not an early retiree. The Board will pay both the teacher's and the Board's one-time contribution to the Teachers' Retirement System for Early Retirement.

\* \* \*

9.05.10 Should this Early Retirement be terminated, individuals already on the Early Retirement Plan and those who, during the year, have been approved for the Plan will be allowed to continue despite the termination of the Plan with respect to all other individuals."

The effect of these provisions, in particular section 9.05.04, was that the defendant would pay 100% of the premium for a retiree's "single" (or individual) health insurance plan, and 50% of the cost of a retiree's "family" plan.

Section 9.05 of the 2001 contract differed in a few minor ways but provided the same level of benefits. The first change under the 2001 contract was that section 9.05.01 required only 10 years of full-time employment in the district prior to retirement (instead of 15 years). Section 9.05.03 was rewritten to require that: individuals desiring to participate must complete a particular form, the "Irrevocable Notice of Retirement," which had to be completed in the personnel office between May 1 and July 1 of the year prior to retirement; all applicants applying for early retirement were bound by their decision to participate in the plan, without reference to possible revocation (March 1 had been previously set as the cutoff date for revocation of an early retirement application); and all retirements must occur at the completion of a semester or at the completion of the school year. Section 9.05.04 was changed to provide that the defendant would pay the full cost of the group insurance programs for an individual until that individual became eligible for Medicare, rather than until age 65. Finally, the language formerly found in section 9.05.10 was moved to section 9.05.08 of the 2001 contract. All of the plaintiffs submitted their notices of intent to elect early retirement prior to June 1, 2005, while one of the Earlier Contracts was in effect.

On June 4, 2005, a new contract became effective (the 2005 contract). The provisions relating to early retirement were moved to section 8.06 and were modified. Many of the changes were minor. The first three subsections, 8.06.01, 8.06.02, and 8.06.03, largely mirrored subsections 9.05.01, 9.05.02, and 9.05.03 of the 2001 contract, except that subsection 8.06.01 contained more detail regarding how part-time teaching could be applied to the 10-year requirement. A new subsection, 8.06.04, was inserted to provide a time frame for the notice of intent to retire for teachers desiring to retire at the end of the first semester.

However, section 8.06.05, which contained the provisions relating to retirees' health insurance benefits, was substantially changed. It now provided that the defendant would pay for retirees' benefits until they became eligible for Medicare, at the same level as it provided for active teachers still employed by the defendant, rather than at the same level as when the retired teacher was last teaching. During the 2005-06 school year, the defendant agreed to pay 93% of the cost of a single plan for its active teachers. It agreed to pay 90% of the cost of a single plan during the 2006-07 school year. (There was no change in the payment level for family insurance coverage, which remained at 50%.) However, although the defendant charged its active teachers 7% of the premium cost for a single plan in 2005-06 and 10% of the cost in 2006-07, it continued to provide health insurance to retirees at no cost for a single plan during these years.

On June 12, 2006, the defendant and the GEA signed a memorandum of understanding. The memorandum stated that the defendant and the GEA were entering into the memorandum "in order to clarify their agreement on the treatment of retiree insurance contributions currently and in the future." The memorandum stated that the defendant and the GEA agreed that for "teachers who put in their two year notice to retire on or before June 29, 2005," the defendant would pay "100% of the

cost of single and 50% of the cost of family group insurance programs in which the retiree is enrolled," and such benefits would be maintained until the retiree became eligible for Medicare. Teachers who gave notice of their intent to retire after June 29, 2005, would contribute the same percentage of the premium cost as active teachers.

All of the plaintiffs submitted their notices of intent to participate in the early retirement plan and were approved by the defendant for such participation prior to June 29, 2005. However, under the terms of the Earlier Contracts, a teacher could not retire immediately after submitting his or her notice of intent. Rather, the notice of intent had to be submitted between one and two years before the date on which the teacher planned to retire. Thus, although all of the plaintiffs had elected early retirement and had been approved for early retirement by June 29, 2005, some of them continued working after that date.

In August 2007, the 2007 contract took effect. Section 8.06.05 of that contract was the same as the 2005 contract, except that the defendant required active teachers and retirees to pay 11% of the premium costs for a single insurance program in 2007-08, and 1% more each year through the 2011-12 school year, when teachers would be required to pay 15% of the cost. In late April and early May of 2007, the defendant sent out letters to all retirees, stating that beginning July 1, 2007, all retirees would be required to contribute towards the premium costs of their single health insurance plans at the same rate as active teachers. The defendant did not limit the shifting of premium costs to those teachers who had elected early retirement but had not yet retired but, rather, imposed it across the board on all those who had already retired, as well as those scheduled to retire. Some of the early-retirement electors who were still working filed a grievance with the GEA, but it refused to support the grievance, because the change in premium contributions had been bargained and

approved by the then-members of the GEA. After the grievance was denied, the plaintiffs filed suit against the defendant.

The initial complaint, brought on behalf of 91 plaintiffs, alleged breach of contract (count I), promissory estoppel (count II), and equitable estoppel (count III). The defendant moved to dismiss count I on the basis that the plaintiffs lacked standing, as they were no longer active teachers and thus were not parties to the 2007 contract. The defendant also moved to dismiss counts II and III for failure to state a claim. The trial court denied the motions with respect to counts I and II, but granted dismissal of count III. Thereafter, the plaintiffs twice amended their complaint, adding more plaintiffs for an eventual total of 107. The only claims they realleged in their second amended complaint were for breach of contract and promissory estoppel.

The parties filed cross-motions for summary judgment on the breach of contract claim. On October 14, 2008, the trial court granted the plaintiffs' motion and denied the defendant's motion, but reserved the issue of damages. The parties reached a stipulation on damages, and on January 22, 2009, the trial court entered judgment in favor of the plaintiffs on count I in the amount of the stipulated damages. The trial court also found, pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)), that there was no just reason to delay enforcement or appeal of its order while count II (the promissory estoppel claim) remained pending before it. The defendant filed a timely appeal.

ANALYSIS

On appeal, the defendant raises four arguments. First, it argues that the trial court erred in denying its motion to dismiss, because the plaintiffs lack standing to sue to enforce the Earlier Contracts. Second, it contends that the trial court erred in granting summary judgment in favor of the plaintiffs on their contract claim, because they had no vested right to the retiree health insurance

benefits provided in the Earlier Contracts, and those benefits expired when the contracts granting the benefits expired. Third, it argues in the alternative that, even if the retiree health insurance benefits had vested and were intended to survive the expiration of the Earlier Contracts, they were validly modified by the 2005 and 2007 contracts. Finally, the defendant argues that the benefits were limited to those retirees who qualified to participate in an early retirement option (ERO) under the Teachers' Retirement System, and 23 of the plaintiffs did not qualify for the ERO and therefore could not claim benefits. We examine each argument in turn. However, before we do so, we consider whether this case is governed by Illinois law or federal common law interpreting section 301 of the Labor Management Relations Act, 1947 (federal act) (29 U.S.C. §185 (2000)).

Applicable Law

The plaintiffs filed this action under Illinois law, identifying the Illinois common law of contract and promissory estoppel as the law under which they sought relief. In its briefs on appeal, the defendant asserts that there is no Illinois law directly on point. There is a reason for this scarcity of Illinois case law: federal common law developed under section 301 of the federal act is supposed to be applied in any case requiring the interpretation of a collective bargaining agreement. "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law *** is pre-empted and federal labor-law principles *** must be employed to resolve the dispute." Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 405-06, 100 L. Ed. 2d 410, 418, 108 S. Ct. 1877, 1881 (1988). Federal courts have firmly rejected the possibility of applying state law to such suits. See Local 174 v. Lucas Flour Co., 369 U.S. 95, 103, 7 L. Ed. 2d 593, 599, 82 S. Ct. 571, 576 (1962) (noting that federal courts have developed a body of substantive law for the enforcement of collective bargaining agreements, and rejecting the view that

state courts nevertheless "remain free to apply individualized local rules when called upon to enforce such agreements"); Rossetto v. Pabst Brewing Co., 217 F.3d 539, 541 (7th Cir. 2000) (the issue of whether health benefits granted to retirees under a collective bargaining agreement survives the termination of the agreement "must be decided as a matter of federal common law developed under the authority of section 301").

As this preemption affects only the applicable law, not the appropriate forum or jurisdiction, it is an argument that can be forfeited. See Stoll v. United Way of Champaign County, Illinois, Inc., 378 Ill. App. 3d 1048, 1058 (2008) (Myerscough, J., specially concurring) (applying Illinois law to a claim that would otherwise be controlled by section 301 and the federal common law interpreting it because the defendant forfeited the application of federal law). Here, despite the fact that the cases cited by the parties explicitly refer to the preemptive nature of section 301 and federal common law in this area, the record does not reveal that the defendant ever argued, before either the trial court or this court, that federal law preempts Illinois law in this case. Instead, apparently overlooking this argument, the defendant simply argues that the federal cases it cites should be treated as persuasive authority. Thus, the preemption argument is forfeited and we are free to apply Illinois law. Stoll, 378 Ill. App. 3d at 1058 (Myerscough, J., specially concurring).

Nevertheless, we believe that the interests of justice and the development of a sound body of precedent require the application of federal common law here. In re Marriage of Holthaus, 387 Ill. App. 3d 367, 378 (2008). We observe with respect the United States Supreme Court's statements regarding the importance of a uniform body of law in cases involving the interpretation of collective bargaining agreements. See, e.g., Lingle, 486 U.S. at 404 & n.3, 100 L. Ed. 2d at 417 & n.3, 108 S. Ct. at 1880 & n.3. Accordingly, throughout this opinion we look to federal law in addressing the

substantive issues raised by the parties, although we include citations to Illinois law where the issue is purely procedural or reference to state law may be helpful.

Standing

The defendant claims that the trial court erred in denying its motion to dismiss the plaintiffs' breach of contract claim for lack of standing. We review de novo the grant or denial of a motion to dismiss brought pursuant to section 2--619 of the Code of Civil Procedure (735 ILCS 5/2--619 (West 2008)). DeLuna v. Burciaga, 223 Ill. 2d 49, 59 (2006). The defendant begins by stating the proposition that, "to have standing to sue, a plaintiff must allege a direct injury to his rights and not merely that he will suffer in some indefinite way." White Hen Pantry, Inc. v. Cha, 214 Ill. App. 3d 627, 635 (1991). As the plaintiffs here have alleged that the defendant is attempting to require them to pay a portion of their health insurance premiums in violation of their contractual rights under the Earlier Contracts, they have sufficiently alleged a direct injury. However, the defendant also notes that, generally speaking, only a party to the contract, one in privity with a party to the contract, or a third-party beneficiary of the contract has standing to sue on a contract. Cha, 214 Ill. App. 3d at 635. The defendant argues that the only parties to the contracts at issue were itself and the GEA. Article I of the contracts recites that the GEA is "the exclusive and sole negotiation agent for contractually certified employees, which includes teachers, nurses, certified guidance and media personnel." Because the plaintiffs are now retirees, not active employees of the defendant or current members of the GEA, the defendant argues that they are no longer in privity with the GEA and therefore have no standing to sue for breach of the Earlier Contracts.

The largest flaw in the defendant's argument is its confusion of the current collective bargaining agreement with the Earlier Contracts. As the defendant correctly notes, the GEA was

acting as the agent of the plaintiffs in negotiating and advancing for ratification the Earlier Contracts, as all of the plaintiffs were active teachers and GEA members when at least one of the Earlier Contracts was in effect. The Earlier Contracts negotiated by the GEA on behalf of the then-active teachers (including the plaintiffs) imposed certain obligations on those teachers and also granted them certain benefits. Accordingly, the plaintiffs were in privity with the GEA with respect to those Earlier Contracts and were, in a sense, parties to those contracts. The fact that the GEA no longer represents the plaintiffs' interests, because they are now retirees, means that the plaintiffs might not have standing to sue on the later collective bargaining agreements in which the GEA did not represent them. However, that does not mean that the plaintiffs' previous relationship to the Earlier Contracts, as persons on whose behalf those contracts were negotiated, and who were obligated under and benefitted by those contracts, has evaporated.

Under federal law, retirees have standing to sue for benefits granted under previous collective bargaining agreements. In <u>Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.</u>, 404 U.S. 157, 181 n.20, 30 L. Ed. 2d 341, 358 n.20, 92 S. Ct. 383, 398 n.20 (1971), the United States Supreme Court commented that, although unions need not bargain on behalf of retirees (whom they do not directly represent), retirees are not without protection, because "[u]nder established contract principles, vested retirement rights may not be altered without the [retiree's] consent," and if such benefits were so altered, the retiree "would have a federal remedy under §301." Ever since, federal courts have regularly permitted retirees to sue under section 301 to enforce rights to retirement benefits allegedly contained in collective bargaining agreements. Federal courts "have recognized a number of situations in which individual plaintiffs, not personal signatories to a collective bargaining agreement, may nonetheless sue an employer for breach of a

collective bargaining agreement without also suing the union" under section 301. Anderson v. AT&T Corp., 147 F.3d 467, 473 (6th Cir. 1998). In these cases, standing rests on the rule that "a promise in a collective bargaining agreement to pay certain wages" or retirement benefits to a class of employees "makes those employees third-party beneficiaries of the agreement for purposes of Section 301." Anderson, 147 F.3d at 473. Thus, even where the union owes no duty to the plaintiffs because they are not current members of the bargaining unit, the courts "have long recognized that the plaintiff can recover for the employer's breach of a collective bargaining agreement" as a third-party beneficiary of the agreement. Anderson, 147 F.3d at 473.

In arguing that the plaintiffs lack standing under federal law, the defendant relies on In re UAL Corp., 443 F.3d 565, 570 (7th Cir. 2006), in which the Seventh Circuit disparaged a potential argument (not actually raised by the plaintiffs there) that the plaintiffs, who were retired United Airlines pilots, had the right to block a bankruptcy court's modification of UAL's pension obligations, because they were third-party beneficiaries of the collective bargaining agreement. This case is not particularly helpful to the defendant, for several reasons. First, the Seventh Circuit's statements were clearly obiter dicta, as the argument the court purported to reject had not been raised and thus was not before the court. See People v. Williams, 204 Ill. 2d 191, 206 (2003) (obiter dicta are comments in a judicial opinion on a matter not briefed by the parties). Second, the posture of the case and the fact that the issue arose as part of UAL's bankruptcy had much to do with the court's statements: the court noted that the plaintiffs were not complaining about the actual termination of the pension plans by the bankruptcy court, but rather about the bankruptcy court's decision that the plaintiffs were not entitled to have their representative present during bankruptcy-related negotiations between UAL and the airline pilots' union (of which the plaintiffs were no longer active members). In making its

statements, the Seventh Circuit recognized the general rule that a person is a third-party beneficiary of a contract if the parties to the contract intended that person to have the right to enforce the contract, and that beneficiaries under a benefits plan established by a collective bargaining agreement have standing to sue for those benefits. However, the court rejected the potential argument that the plaintiffs' status as third-party beneficiaries of the collective bargaining agreement meant that they were intended to have the power to block any modification of the collective bargaining agreement that was necessary as part of the bankruptcy process. In re UAL Corp., 443 F.3d at 570. Given the factual and procedural distinctions between that case and the one currently before us, we find that the statements made in UAL Corp. do not apply here. Rather, we look to the holdings of Pittsburgh Plate Glass, Anderson, and the other cases discussed here, in finding that the plaintiffs had standing to sue for benefits granted to them under the Earlier Contracts.

Did the Benefits Granted by the Earlier Contracts Terminate When Those Contracts Ended?

The defendant next argues that, under federal case law including Cherry v. Auburn Gear, Inc., 441 F.3d 476 (7th Cir. 2006), and Rossetto, whatever health insurance benefits may have been granted to retirees under the Earlier Contracts expired when those contracts expired. As we have noted, the plaintiffs argue that these federal cases are not applicable here, because they sued under Illinois contract law. However, the plaintiffs also contend that, regardless of whether federal or Illinois law is applied, the Earlier Contracts unambiguously promised them health insurance benefits meant to survive the termination of the contracts themselves.

The trial court granted summary judgment in favor of the plaintiffs and denied the defendant's motion for summary judgment with respect to this issue. A motion for summary judgment is properly granted where the pleadings, depositions, admissions, and affidavits establish that no genuine issue

of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2--1005 (West 2006); Gaylor v. Village of Ringwood, 363 Ill. App. 3d 543, 546 (2006). When the parties have filed cross-motions for summary judgment, they believe the matter presents to the court no genuine issues of material fact, only questions of law. Gaylor, 363 Ill. App. 3d at 546. However, the fact that the parties filed cross-motions for summary judgment does not establish the absence of factual issues sufficient to preclude summary judgment; both the trial court and the reviewing court may independently determine that a genuine issue of material fact exists despite the parties' belief that no factual issue exists. Gaylor, 363 Ill. App. 3d at 547. We review de novo the trial court's determination on cross-motions for summary judgment. Gaylor, 363 Ill. App. 3d at 547.

No federal statute requires employers to grant health insurance benefits to retirees, and such benefits are vested only if the contract under which they were provided so states. Bland v. Fiatallis North America, Inc., 401 F.3d 779, 783 (7th Cir. 2005). Thus, the question of whether the retiree health insurance benefits have vested, so that they survive the expiration of the agreement granting them, is decided by applying the principles of contract construction. Bland, 401 F.3d at 783. Under these rules, the starting point is the plain language of the contract. Winnett v. Caterpillar, Inc., 553 F.3d 1000, 1008 (6th Cir. 2009). "[B]ecause employers are not legally required to vest benefits, the intention to vest must be found in 'clear and express language.' " Bland, 401 F.3d at 784, citing Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co., 520 U.S. 510, 515, 137 L. Ed. 2d 763, 769, 117 S. Ct. 1513, 1515 (1997). However, the contract need not "use the word 'vest' or some variant of it, or *** 'state unequivocally' that the employer is creating rights that will not expire." Bland, 401 F.3d at 784. Rather, the language of the contract must be read as a whole with its words given their ordinary, popular meaning, as construed by a person of " 'average intelligence

and experience.' " Bland, 401 F.3d at 784, quoting Grun v. Pneumo Abex Corp., 163 F.3d 411, 420 (7th Cir. 1998).

Applying this standard to the contracts before us, we find that the language of section 9.05.04 of the Earlier Contracts clearly expressed the intent that the duration of the retiree health insurance benefits was to extend beyond the expiration of the contracts. Under the 1991 and 1998 contracts, the provision stated that benefits would be paid until the retiree reached the age of 65. The 2001 contract stated that the benefits would be paid until the retiree became eligible for Medicare. This language plainly set out the time during which the benefits would be paid, in terms separate and independent from the duration of the contracts themselves. In agreeing to this duration, the parties could reasonably expect that the defendant's obligation with respect to retiree health insurance benefits would extend beyond the expiration of the contract, because teachers could not elect early retirement unless they were under the age of 60 (and thus the window in which they would receive benefits would be at least five years), while the collective bargaining agreements expired every three or four years and accordingly would likely expire before then. There was no contrary language limiting the duration of the benefits to the term of the contracts. Thus, read as a whole, the Earlier Contracts express an unambiguous intent to provide retiree health insurance benefits until the retirees reached age 65 or became eligible for Medicare.

The defendant argues that, under the case law developed in the Seventh Circuit, there is a presumption that retiree health insurance benefits terminate when the collective bargaining agreement providing for them expires, and that this presumption "imposes a high burden of proof upon *** retirees." Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006). However, the cases state that this presumption applies only if a collective bargaining agreement is utterly silent on the question

of whether the health insurance benefits provided therein were intended to survive the expiration of the collective bargaining agreement. Bland, 401 F.3d at 784 (the presumption against vesting arises when the agreement is silent on the issue, and is an "exploding presumption" that ceases to exist if there is any evidence to the contrary); Rossetto, 217 F.3d at 544 ("Our presumption against vesting, it is important to emphasize, kicks in only if all the court has to go on is silence"). Here, the Earlier Contracts were not silent: they contained clear durational terms for the benefits, stating that the benefits would be paid until the retiree reached age 65 or Medicare eligibility. Thus, the presumption is not applicable. Bland, 401 F.3d at 786-87; Rossetto, 217 F.3d at 543.

The defendant also argues that this case is like Cherry and other Seventh Circuit cases in which the court held that an apparent grant of vested benefits was contradicted by a reservation of rights or different durational term. In Cherry, the collective bargaining insurance agreement (CBIA) at issue contained an opening provision stating that the employer would maintain the benefits listed therein "during the period of this agreement." Cherry, 441 F.3d at 483. Thus, although the agreement also purported to grant retirees "lifetime" health insurance benefits, that grant was modified by the term "during the period of this agreement," with the result that the benefits (however they were described) expired at the end of the agreement and were not vested. Cherry, 441 F.3d at 484 ("So long as the CBIA was in effect, benefits remained valid; when the CBIA ceased to be effective, 'lifetime benefits' ceased as well"); see also Pabst Brewing Co. v. Corrao, 161 F.3d 434, 440 (7th Cir. 1998) (benefits were limited by language stating they were provided " 'during the period of this agreement' "). Similarly, in United Mine Workers v. Brushy Creek Coal Co., 505 F.3d 764 (7th Cir. 2007), the collective bargaining agreement granted retirees health insurance benefits "for life," and the question was "whether the promise was withdrawn elsewhere in the documentation

constituting the parties' overall agreement." Brushy Creek, 505 F.3d at 766. The court held that it was, because the collective bargaining agreement also contained a reservation of rights stating that the benefits were provided " 'for the term of this Agreement only' " and could be " 'amended or modified in any manner at any time after the expiration or termination of this agreement.' " Brushy Creek, 505 F.3d at 766-67. Thus, the retirees had no right to their "lifetime benefits" after the agreement ended.

The flaw in the defendant's attempt to compare these cases to the one before us is that, in this case, the Earlier Contracts did not contain any similar language limiting the grant of benefits or reserving the defendant's right to modify the benefits. The only contract language that the defendant points to in support of this argument is section 14.01, which simply set out the term of each contract. This language merely stated that the contract would take effect on a given date and remain in effect for three years unless extended by the parties. It did not state that the benefits granted in the contract were limited to the term of the contract, or even mention those benefits. As such, it did not purport to limit the specific language of section 9.05.04 providing that retiree health insurance benefits would be provided until the retiree turned 65 or became eligible for Medicare, nor did it provide that the defendant retained the right to modify the benefits granted under the contract after the expiration of the contract. The defendant has not pointed to any case, whether decided by the Seventh Circuit or another court, holding that such a bare statement of a contract's duration is sufficient, without more, to limit the benefits granted under the contract. Accordingly, we find Cherry and the other cases cited by the defendant to be distinguishable.

Indeed, contrary to the defendant's argument, other provisions of the Earlier Contracts support the plaintiffs' argument that the health insurance benefits provided to early retirees were

intended to vest and become nonmodifiable. For instance, section 9.05.10 of the 1991 and 1998 contracts, and section 9.05.08 of the 2001 contract, provided that even if the parties decided to end the early retirement plan and discontinue providing the listed benefits for future retirees, those who were already participating in the plan would continue to receive the benefits:

"Should the Early Retirement Plan be terminated, individuals already on the Early Retirement Plan and those who during the year have been approved for the Plan will be allowed to continue despite the termination of the Plan with respect to all other individuals."

At oral argument, the defendant asserted that this provision was intended to apply only to the possible termination of a separate state program regulating the availability of full annuities in early retirement, but the language of the Earlier Contracts does not support this interpretation, as there is no evidence of any such limitation in either the quoted provisions or other contract provisions. In light of this language providing that the benefits provided to early retirees and those approved for early retirement could not be terminated even if the defendant and the GEA decided to stop providing the benefits in the future, and in the absence of any provisions limiting the benefits to the term of the contracts, we find that the Earlier Contracts unambiguously granted the plaintiffs vested rights in the benefits.

"If the agreement expressly grants such benefits [extending beyond the expiration of the agreement], the plaintiff is entitled \*\*\* to a judgment in his favor." Rossetto, 217 F.3d at 547. Here, the Earlier Contracts unambiguously provided that retirees such as the plaintiffs would receive the specified health insurance benefits until they turned 65 or became eligible for Medicare, and this grant of benefits was not negated by any other provision of the documents. Accordingly, the trial court did not err in granting summary judgment on this issue to the plaintiffs.

When Did the Plaintiffs' Contractual Rights to the Benefits Vest?

Having decided that the plaintiffs' rights to the benefits at issue were vested, we next examine the issue of when those rights vested. The defendant argues that the date of vesting affects the legal rights of some of the plaintiffs: those who, although they submitted their notice of intent to retire by June 2005, did not actually retire until sometime after that. The defendant argues that, if the benefits did vest under the Earlier Contracts, they vested no earlier than the time that each plaintiff retired. Thus, the defendant contends that those plaintiffs who were employed during the 2005-06 and/or 2006-07 school years are entitled only to those retirement benefits provided in the 2005 contract rather than those provided under the 2001 contract. (The defendant does not contend that the date of vesting affects the rights of the remainder of the plaintiffs.)

In support of its argument that the benefits at issue here vested only upon each plaintiff's retirement, the defendant relies on Winnett v. Caterpillar, Inc., 553 F.3d 1000 (6th Cir. 2009). The plaintiffs in Winnett were former employees of Caterpillar. In 1988, Caterpillar and the union to which the plaintiffs belonged entered into a collective bargaining agreement providing that retirees would receive certain benefits. Specifically, the 1988 agreement stated that employees would receive certain benefits if they "retire[d] and [were] eligible for the immediate receipt of a pension (with at least 5 years of credited service)." Winnett, 553 F.3d at 1009. The 1988 agreement expired in 1991, before any of the plaintiffs actually retired. The plaintiffs retired between 1991 and 1998. Caterpillar provided the plaintiffs with less favorable retirement benefits, and the plaintiffs sued. The court held that the plaintiffs had no claim for the retirement benefits contained in the 1988 agreement, because, under the terms of that agreement, retirement benefits were tied to the date when an employee retired and was "eligible for the immediate receipt of a pension." Winnett, 553 F.3d at 1009. When the 1988

agreement expired, the plaintiffs' right to the retirement benefits had not vested because they had not yet retired.

In reaching this holding, the court distinguished between active employees, who are represented by a union that continues to bargain on their behalf and who may choose for themselves whether and when to retire, and retirees, who have already chosen retirement:

"The difference in status between a worker eligible to retire and a retired worker is a matter of the worker's choice about how long to work. When a particular collective bargaining agreement is about to expire, eligible workers are 'free to decide' *** whether to continue to earn income or to accept the retirement benefits offered to them under the particular agreement." Winnett, 553 F.3d at 1010, quoting Pittsburgh Plate Glass, 404 U.S. at 181, 30 L. Ed. 2d at 359, 92 S. Ct. at 399.

This language highlights an important difference between Winnett and this case. In Winnett, there was no requirement that an employee announce his intent to retire prior to actually retiring. Thus, an employee remained "free to decide" whether to retire up to the moment at which the employee in fact retired. By contrast, in this case, participation in the early retirement plan under the Earlier Contracts was conditioned on the submission of a notice of intent one to two years prior to the date on which the employee wished to retire, and the defendant's approval of the early retirement. Here, all of the plaintiffs who were employed by the defendant after June 2005 had already submitted a notice of intent to take early retirement, and their early retirement had been approved by the defendant. Under the 2001 contract, which was the contract in effect in June 2005, such notices were "irrevocable." Thus, although these plaintiffs continued to work after June 2005 (as they were required to do, since the notice of intent had to be submitted in advance), they had already irrevocably

chosen to cease working on the date specified and "accept the retirement benefits offered to them" under the 2001 contract. These plaintiffs were more like the Caterpillar employees who had already retired and whose decision about whether to keep working was foreclosed, than like the active Caterpillar employees who remained free to continue working as long as they thought best.

Although we, like the court in Winnett, look to the language of the contract in order to determine when vesting occurred, we reach a different conclusion because of differences in that language. Reading section 9.05 (the portion of the Earlier Contracts establishing the early retirement plan) as a whole, the language demonstrates that the parties intended the right to participate in early retirement to vest once the defendant approved a teacher's notice of intent. Several of the provisions refer to such persons as those whose rights under the plan would be protected. Section 9.04.05, the key provision defining the benefits to be provided, states that the defendant will pay the specified insurance premiums for those teachers "approved as *** participant[s] in the Early Retirement Plan." In section 9.05.10 of the 1991 and 1998 contracts (and section 9.05.08 of the 2001 contract), the parties agree that "individuals already on the Early Retirement Plan and those who during the year have been approved for the Plan" will continue to receive the benefits provided under the plan even if the plan is terminated. (Emphasis added.) Other provisions, including section 9.05.09 of the 1991 and 1998 contracts, and section 9.05.12 of the 1991 and 1998 contracts (which is the same as section 9.05.10 of the 2001 contract), state that benefits under the early retirement plan will be provided to those who have been approved by the defendant as participants. The defining act in all of these provisions is the defendant's approval of a teacher's notice of intent to participate in the early retirement plan. None of the other eligibility requirements--being less than 60 years of age, having in excess of the specified amount of full-time employment with the school district (and presumably

retirement itself, although this is not discussed)--occupies such a central role in defining the persons to whom the benefits will be paid. Accordingly, we hold that, under the same analysis used in Winnett and other federal case law that focuses on the language of the contract to establish the time of vesting, the benefits here vested when the defendant approved each plaintiff's participation in the early retirement plan.

Could the Defendant and the GEA Modify the Benefits Despite the Plaintiffs' Vested Rights?

The defendant next argues that, even if the plaintiffs' rights to the early retirement benefits were vested, those plaintiffs who retired after the 2005 and 2007 contracts were ratified by the GEA's membership (sometime in the spring of those years) assented to the modification of their retirement benefits under those contracts by participating in the ratification process. This argument rests on the idea that these post-spring 2005 retirees (the "later retirees") affirmatively agreed to modify their own vested benefits and accept instead the lesser benefits available under the later contracts. The defendant has not established either the factual predicate or legal support for this argument.

As a preliminary matter, the defendant has not established that the later retirees in fact took any actions affirmatively indicating that they wished to be bound by the later contracts. The only evidence the defendant proffers is that the later retirees continued to work during the time that the later contracts were being negotiated and ratified. From this, the defendant wishes us to draw the inference that, in continuing to work after the expiration of the 2001 contract, the later retirees continued to be represented by the GEA, and thus were bound by the GEA's ratification of the later contracts. We note that the defendant has not provided any evidence that the later retirees in fact participated in the ratification of the 2005 and 2007 contracts, by voting or in some other way, or even that the later retirees were members in good standing of the GEA when these contracts were

ratified. Moreover, any actions that the later retirees had a preexisting obligation to perform cannot demonstrate an intent to assent to modification. Boomer v. AT&T Corp., 309 F.3d 404, 416 (7th Cir. 2002) (preexisting contractual obligation does not provide consideration); Robinson v. Ada S. McKinley Community Services, Inc., 19 F.3d 359, 364 (7th Cir. 1994) (where continuing to work merely constituted performance under the original contract, continued work did not show acceptance of or consideration for modification of the contract). Here, the 2001 contract obligated the later retirees to continue working until their preapproved date of retirement. Membership in the GEA likewise appears to have been a preexisting duty, not an affirmative undertaking: to the extent that we could draw the inference that all teachers who were actively working were GEA members, we could do so only by drawing the related inference that such membership was required for all active teachers. Thus, the defendant has not shown that the later retirees took any affirmative actions suggesting a desire to be bound by the later contracts.

Moreover, other evidence submitted by the parties suggests that the parties intended that the later retirees would not lose their vested benefits. As noted, by June 1, 2005, all of the later retirees submitted notices of intent to take early retirement and, no later than June 29, 2005, they were approved to participate in the early retirement plan by the defendant. These notices were submitted while the 2001 contract was in effect. Thus, both parties could reasonably have believed and intended that the later contracts would not affect the plaintiffs' retirement benefits, despite the fact that some of the teachers were required to continue working for one or two more years under the terms of the 2001 contract. The defendant's actions confirm this intent. Although the 2005 contract stated that retirees under the early retirement plan would have to pay a percentage of the premiums for individual coverage, during the 2005-06 and 2006-07 school years the defendant continued to pay the cost of

coverage for retirees in full. The defendant further confirmed this interpretation when, in June 2006, it entered into a memorandum of understanding on the issue of "retiree insurance contributions currently and in the future," stating that the defendant would continue to pay the full cost of individual coverage for "teachers who put in their two year notice to retire on or before June 29, 2005." It is undisputed that all of the plaintiffs are within this group. Under these circumstances, the mere fact that the later retirees continued to work for another year or two as required by the 2001 contract does not show that they assented to the modification of their vested benefits.

Nor has the defendant established the necessary legal support for its argument. The general rule regarding the modification of vested benefits is that, "[u]pon vesting, benefits become forever unalterable." Bland, 401 F.3d at 784; see also Winnett, 553 F.3d at 1009 ("once benefits vest, an employer's unilateral modification or reduction of benefits constitutes a Section 301 violation"). The defendant has not identified any precedent in which simply continuing to work under similar circumstances was held to constitute assent to a reduction of vested benefits. The sole legal support cited by the defendant is Olson v. Etheridge, 177 Ill. 2d 396, 409 (1997), which states that the vested rights of third-party beneficiaries of a contract can be modified if the beneficiaries assent to the modification. However, as we have stated, the defendant has not put forward any evidence demonstrating that the later retirees assented to the modification of their early retirement benefits. In the absence of such evidence, the defendant has not established the existence of a genuine issue of fact regarding whether the later retirees assented to be bound by the later contracts.

In short, neither the record nor the law supports a finding that the later retirees agreed to forgo the retirement benefits conferred under the 2001 contract in favor of the lesser benefits contained in the 2005 and 2007 contracts.

Should 23 of the Plaintiffs be Excluded from the Early Retirement Benefits?

Lastly, the defendant contends that judgment should be entered in its favor as to 23 of the plaintiffs, because they did not properly qualify for the benefits at issue under the Earlier Contracts. Specifically, the defendant claims that, although the 23 plaintiffs met the other eligibility requirements contained in the Earlier Contracts, those contracts also imposed the requirement that the teachers participate in a separate plan, the Teachers' Retirement System Early Retirement Option (ERO). (The ERO is set out in a portion of the Pension Code (hereinafter Teachers' Retirement System Act or Act) (40 ILCS 5/16--101 et seq. (West 2008)).) The ERO imposed different and additional age and experience qualifications, beyond those necessary under the collective bargaining agreements in effect between the defendant and the GEA, and the 23 plaintiffs do not meet these additional requirements. The plaintiffs argue that participation in the ERO was not a condition of participation in the early retirement plan established by the Earlier Contracts. The plaintiffs also argue that even if participation in the ERO had been a condition precedent to participation in the defendant's early retirement plan, the defendant waived this argument, both by failing to raise it as an affirmative defense in its answer, and by voluntarily approving the participation of the 23 plaintiffs in its early retirement plan.

The plaintiffs argue, and the defendant concedes, that section 9.05 of the Earlier Contracts does not state that participation in the ERO is required. Rather, section 9.05.04 says that, "[w]hile on the Illinois Teachers' Retirement System Early Retirement Plan," the participants in the defendant's early retirement plan will receive the listed benefits. The parties further agree that no such "Teachers' Retirement System Early Retirement Plan" exists. However, the defendant argues that this phrase is meant to refer to the ERO. The plaintiffs argue that the phrase refers to the portion of the Act that sets out annuities for teachers who retire early, and that the ERO is simply a part of that portion of

the Act, one method by which a teacher who is retiring early can avoid reduction of his or her annuity. The plaintiffs also point out that other provisions of section 9.05 (sections 9.05.09 and 9.05.12 of the 1991 and 1998 contracts, and section 9.05.10 of the 2001 contract) provided the same retirement benefits to the plaintiffs but did not include any mention of the Act, instead speaking only of the "Early Retirement Plan," a phrase used elsewhere simply to refer to the defendant's own early retirement benefits. We need not resolve this dispute, however, as regardless of whether the phrase "Early Retirement Plan" as used in section 9.05.04 was intended to refer to the ERO, the defendant has forfeited its right to disqualify any of the plaintiffs based on nonparticipation in the ERO.

It is well established that a party's failure to raise an affirmative defense in its answer forfeits a defendant's ability to argue that defense. Larkin v. Sanelli, 213 Ill. App. 3d 597, 602 (1991). Even more telling, however, are the defendant's voluntary actions indicating an intent to waive ERO participation as a requirement for participation in its own early retirement plan, if indeed there was such a requirement. It is undisputed that the defendant approved all of the plaintiffs, including the 23 plaintiffs at issue here, for participation in its early retirement plan. If any of the plaintiffs were in fact ineligible because they had not chosen to participate in the ERO, the defendant could have denied those persons' applications for early retirement. A party may waive a provision placed in a contract for its benefit by conduct establishing that it does not intend to insist on compliance with the provision. Caisse Nationale de Credit Agricole v. CBI Industries, Inc., 90 F.3d 1264, 1275 (7th Cir. 1996). Such waiver may include waiver of a condition precedent. LaSalle National Bank v. Metropolitan Life Insurance Co., 18 F.3d 1371, 1375 (7th Cir. 1994). The defendant's approval of early retirees who were not ERO participants was conduct unambiguously indicating that the defendant did not intend to insist that all early retirees also be participants in the ERO.

The defendant argues that it should not be held to have waived compliance with this condition, because it did so based on the mistaken belief that participation in the ERO was not required. The defendant cites to Breckenridge v. Cambridge Homes, Inc., 246 Ill. App. 3d 810, 817 (1993), a case holding that a mistake of fact can negate the intent necessary for waiver. But the defendant's mistake was one of law: when it approved the plaintiffs for participation in its early retirement plan, it interpreted the contract as the plaintiffs do, to mean that participation in the ERO was not necessary. Its misinterpretation of its own contract (if it was a misinterpretation) cannot be excused as a mistake of fact. Rather, it appears that the defendant has changed its mind about what the contract says and now seeks to be excused from performing as it said it would.

Moreover, where one party to a contract simply fails to ascertain whether another has complied with a condition precedent to that contract, it may not excuse its actions on the basis of ignorance. Parties are "presumed to know those things which reasonable diligence on their part would bring to their attention," and hence the lack of diligence cannot defeat the application of waiver. Whalen v. K Mart Corp., 166 Ill. App. 3d 339, 344 (1988); see also Strauss v. Sullivan, 991 F.2d 800 (7th Cir. 1993) (table) (where party has the ability to determine whether a condition precedent has been met but fails to do so through lack of diligence, it has waived the condition precedent). Through the approval process, the defendant had the power to determine whether applicants for early retirement met the plan's requirements. It cannot now disclaim the manner in which it exercised that power. For all of these reasons, we find that the defendant has forfeited the application of the alleged condition precedent that it now seeks to raise. The trial court did not err in holding that benefits could not be denied to the 23 plaintiffs on the basis of the "Teachers' Retirement System Early Retirement Plan" language in section 9.05.04 of the Earlier Contracts.

When the defendant and the GEA entered into the Earlier Contracts, the defendant was free to make whatever contract with respect to retiree health benefits that it wished. It agreed to offer certain benefits to teachers who chose to retire early and who met the requirements contained in those contracts. Presumably, the defendant would not have agreed to offer these benefits unless they were to its advantage in some way. Perhaps the early retirement benefits allowed it to reduce its expenses for tenured teacher salaries. Perhaps they simply assisted it to attract and retain qualified teachers. Either way, the benefits were part of the promised compensation for which the plaintiffs agreed to work. At this point, the plaintiffs have fully performed their obligations under the contracts, and the defendant has had the benefit of that performance. The defendant cannot now disavow its own obligations under those contracts.

## CONCLUSION

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

O'MALLEY and JORGENSEN, JJ., concur.