# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2703

LOU BLAND, EDWARD HODGEMAN, GERALDINE
ROSATO, ERVIN SHORES, and RICHARD HORCHER,

*Plaintiff-Appellants*,

v.

FIATALLIS NORTH AMERICA, INC., CASE NEW
HOLLAND, INC., and CNH HEALTH AND
WELFARE PLAN,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02-CV-69—**James B. Zagel**, *Judge.*

_____

ARGUED JANUARY 19, 2005—DECIDED MARCH 15, 2005

_____

Before CUDAHY, MANION and EVANS, *Circuit Judges*.

CUDAHY, *Circuit Judge*. A "lifetime" can be a slippery concept in the context of retiree benefits litigation under the Employee Retirement Income Security Act ("ERISA"), 42 U.S.C. §§ 1001 *et seq.* (2005). This case asks us to consider, on the heels of *Vallone v. CNA Financial Corporation*, 375 F.3d 623 (7th Cir. 2004), whether designating retiree

benefits as "lifetime" really means "for life." Unlike previous cases, where the interpretation of explicit "lifetime" language was constrained by reservation of rights clauses allowing an employer to modify or terminate retiree welfare benefits, the plan documents at issue here contain no such limiting language. Accordingly, we find that the "lifetime" language, as used here, is ambiguous as to vesting, and so we reverse the grant of summary judgment to the defendant and remand this case for further proceedings.

## I.

The plaintiffs in the present case are former retired salaried and hourly employees of Fiatallis North America, Inc. ("FANA"), who retired in the late 1970s through 1988 and their surviving spouses. Most are at least eighty years of age and are presumably on fixed incomes. Before or upon their retirement, each of the plaintiffs received documents known as "summary plan descriptions" ("SPDs") that described the medical and dental benefits that they would receive and that allegedly contained explicit promises that retirees and their spouses would continue to receive these benefits at little or no cost until their death.

Of the five SPDs at issue in this case, three refer to salaried employees, and two address hourly employees. We will discuss the SPDs in the chronological order of their issuance. An SPD related to a "Benefit for Retired Salaried Employees Plan," which covers retired salaried employees who retired after Dec. 31, 1976, provides that health insurance and dental ". . . coverage remains in effect as long as your or your surviving spouse are living." The SPD related to a "Group Health Plan for Salaried Active Employees," dated January of 1978 and distributed to active salaried employees, states in pertinent part that upon retirement "benefits continue to be paid for by the Company," and that employees who wish to continue major medical coverage

must "continue to pay [their] share of the cost."[1] With respect to retirees' spouses, the plan document states that the "spouse and any eligible dependents . . . can continue the protection" until the spouse "dies, remarries, or is covered by another employee's group plan"; spouses are "required to make monthly payments for both Basic and Major Medical coverage." The two plan documents applicable to hourly employees are essentially identical. The "Health Benefits Plan" and "Benefits for Retired Hourly Employees Plan" documents, created in January of 1978 and distributed to hourly employees at FANA's Carol Stream and Deerfield plants, both state that ". . . [b]enefits are provided to help you meet the expense of illness, injury, and other similar emergencies within your family" and that "[i]f a retired employee dies, the surviving spouse will have basic coverage continued for his or her lifetime at no cost." Finally, plan documents dated March and April of 1985, titled "Benefit Fact Sheets,"[2] that were provided to salaried employees affected by the shutdown of FANA's Springfield plant, state that "[s]alaried employees for retirement will have the retired employee benefits in effect prior to March 1, 1985."[3] None of these documents contain express reservation of rights clauses.

In the mid-1980s, FANA and its Italian parent corporation sought advice from three outside law firms as to whether these retiree plan benefits were vested. The employer had in mind an "onion solution" to deal with rising insurance costs, under which retiree benefits would be grad-

---

[1]  Plaintiffs contend that this SPD was in effect for active salaried employees from January of 1978 through March or April of 1985.

[2]  These documents were never designated by FANA as SPDs.

[3]  Plaintiffs assert that the Benefit Fact sheets referenced the benefits described in the Benefit for Retired Salaried Employees Plan.

ually peeled away. Lou Bland, a named retiree plaintiff, who served as a former vice-president and member of the Employee Benefits Committee, received copies of documents discussing the onion solution in the course of his employment, and retained these documents upon retirement.

In 1989, FANA published another SPD for active employees that altered the description of plan benefits and expressly reserved the right to amend benefits; this document did not state that these changes were effective with respect to retirees, and no plaintiff received it. Late in 2000, however, the plaintiffs received plan documents containing new benefit descriptions, which stated that costs for medical and dental coverage would dramatically increase as of February 1, 2001 and warned that benefits could be modified even after retirement.[4]

Angered by these modifications, plaintiffs filed suit in Illinois state court, contending that FANA had unilaterally

---

[4] The new "BenefitSelect" Medical Plan implemented on February 1, 2001, increased retiree cost-sharing features. While it contained hospitalization, X-ray, ambulance, emergency room, and office visit coverages similar to those in the pre-1989 plans, it implemented a preferred provider network system. Non-Medicare-eligible retirees were offered PPO, POS, HMO, and basic protection, and Medicare-eligible retirees were offered a non-network plan. Retirees who elected PPO in-network benefits had many of the same coverage levels for many items as provided under the pre-1989 plan, with costs being covered at rates of 90 to 100 percent and with co-payments between $10 and $25. The POS and HMO plans varied in coverage levels and deductibles, depending on residence. Finally, the non-network plan contained a $500 annual deductible and covered 70% of the expenses found in the network plan. The new BenefitSelect Dental Plan changed the percentage of covered expenses depending on whether retirees elected the PPO or the traditional plan, with some levels of coverage (such as for dentures, bridgework, fillings, and crowns) remaining the same or substantially similar.

reduced vested benefits by greatly increasing the cost to retirees. The case was then removed by FANA to federal district court. After discovery began, the plaintiffs uncovered documents discussing the "onion solution," and turned the documents over to defense counsel on the grounds that the documents might be privileged. FANA then requested a protective order claiming that the documents were privileged as attorney-client communications or work product and moved for the appointment of a magistrate judge to determine privilege issues. After conducting an *in camera* review, the magistrate judge entered a recommendation that most of the documents, including portions discussing the onion solution, were protected and inadmissible since they contained communications including attorney advice and relating exclusively to amendment or termination of the plan. The magistrate also rejected the plaintiffs' claims that numerous exceptions to the privilege applied.

After the district court accepted the magistrate's recommendations, the plaintiffs filed an amended complaint alleging that FANA had established a new health plan less favorable to plaintiffs in February of 2001 in breach of ERISA contract obligations and that FANA had made oral and written promises vesting health benefits that had been breached, thus violating ERISA fiduciary duties and the principles of estoppel. The plaintiffs never sought to certify any class under Fed. R. Civ. P. 23. The parties then filed cross-motions for judgment on the pleadings as to the alleged breach of the ERISA contract obligations claim. The district court awarded judgment on the pleadings to FANA, and the plaintiffs then voluntarily dismissed their other claims without prejudice in order to pursue an appeal of the ruling relating to the alleged breach of ERISA contract obligations. After the district court questioned whether these matters were in fact ripe for appeal, the plaintiffs agreed to voluntarily dismiss their breach of fiduciary duty and estoppel claims with prejudice. Thus, the only issues

before us are whether the plan documents contain language that unambiguously vested ERISA contract rights or that is so ambiguous as to require a trial on the issue of vesting. There is a further question whether the district court erred in not admitting certain documents into evidence under exceptions to the privilege doctrine.

We review the decision to grant FANA's motion for judgment on the pleadings *de novo. Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

## II.

### A.

Today's employment market is heavily impacted by the abruptly rising cost of health care, and the ensuing increases in health insurance premiums. The plan documents in the present case, created in the 1970s and 1980s, likely were the product of a social reality different from that now prevailing. Before 1980, employers in many cases, in granting health benefits, did not consider a possible need to modify them in the future. Only later with "spiraling medical costs, heightened foreign competition, epidemic corporate take-overs and the declining bargaining power of labor" was thought given to modifying benefits granted to retirees. *See Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 613 (7th Cir. 1993) (Cudahy, J., concurring). Thus, at the time the relevant plan documents were created, there may not have been much thought given to any language affecting possible future changes in benefits. This expectation has now changed, and many courts have rejected retirees' attempts to show that their benefits have vested under the language of plan documents. Meanwhile, retirees living on limited fixed incomes can be squeezed by unanticipated increases in medical costs. It is with this historical context in mind that we turn to the question whether the FANA plan documents vested retiree health benefits here.

Under ERISA, employee benefit plans are classified either as welfare benefit plans or as pension plans. *See* 29 U.S.C. §§ 1002(1), 1002(2)(A) (2005). Pension plans provide retirement income to employees or allow employees to defer the receipt of income until or beyond the termination of the covered employment. 29 U.S.C. § 1002(2)(A) (2005). Welfare benefits, on the other hand, provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . ." 29 U.S.C. § 1002(1) (2005). While pension benefits are subject to strict vesting requirements, welfare benefits such as health and life insurance are vested only if the plan contract so provides. 29 U.S.C. § 1051(1) (2005). *See also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans.") (citation omitted); *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 604-05 (7th Cir. 1993) ("ERISA does not require the vesting of health or other 'welfare' benefits as it does pension benefits.") (citations omitted). Thus, employers are "generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans." *Curtiss-Wright Corp.*, 514 U.S. at 78.

Welfare benefits may vest, however, when employers elect to enter into a private contract with employees as set forth in benefit plan documents. *See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka, & Santa Fe Ry. Co.*, 520 U.S. 510 (1997) (noting that an employer may "contractually cede [ ] its freedom" not to vest benefits). If welfare benefits "vest at all, they do so under the terms of a particular contract." *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632 (7th Cir. 2004) (citing *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998)). An ERISA plan is a contract. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000) (quoting *Anstett v. Eagle-Picker Industries, Inc.*, 203 F.3d 501, 503 (7th Cir. 2000)). Therefore, "[t]he question before us is

essentially one of contract interpretation," and so federal principles of contract construction apply. *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). Under these rules, a document should be read as a whole with all its parts given effect, and related documents must be read together. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1993) (citations omitted). In addition, "we will give contract terms their 'ordinary and popular sense' and avoid resort to extrinsic evidence when faced with unambiguous language." *Diehl*, 102 F.3d at 305. "Contract language is unambiguous if it is susceptible to only one reasonable interpretation." *Murphy*, 61 F.3d at 566 (citations omitted). Only if the language of the plan document is ambiguous and these ambiguities are not clarified elsewhere in the document may we consider evidence of the parties' intent that is extrinsic to the writing. *Vallone*, 375 F.3d at 632-33.

Upon vesting, benefits become forever unalterable, and because employers are not legally required to vest benefits, the intention to vest must be found in "clear and express language" in plan documents. *Inter-Modal Rail Employees Ass'n*, 520 U.S. at 515. *See also Vallone*, 375 F.3d at 632 (stating that . . . "a modification that purports to vest welfare benefits must be contained in the plan documents and must be stated in clear and express language."); *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 667 (6th Cir. 1998) (stating that "the intent to vest . . . must be found in the plan documents and must be stated in clear and express language"); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir. 1999) (stating that "an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language"). Plan language should be read "in an ordinary and popular sense," construed as if by a "person of average intelligence and experience." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998).

We have rejected the position that documents must use the word "vest" or some variant of it, or that the relevant

writings must "state unequivocally" that the employer is creating rights that will not expire, since a court should not refuse to enforce a contract simply because the parties fail to use the "prescribed formula." *Bidlack*, 993 F.2d at 607. In addition, the same principles apply to a vesting analysis whether the retiree benefits are provided under a collective bargaining agreement or under summary plan documents, since "the same underlying considerations are present irrespective of the particular type of document at issue." *Skinner Engine Co.*, 188 F.3d at 139. *See also Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 541 (7th Cir. 2000) (stating that the issue in *Rossetto* was "when a right to health benefits that is granted to retired workers by a collective bargaining agreement (*or an ERISA plan*, but that is not this case) survives the termination of the agreement.") (emphasis added).

This circuit has held that there is a presumption against vesting when there is "silence" that "indicates that welfare benefits are not vested." *Vallone*, 375 F.3d at 632. *See also Rossetto*, 217 F.3d at 544 ("Our presumption against vesting . . . kicks in only if all the court has to go on is silence."). Significantly, this presumption is not an evidentiary presumption, but an "exploding presumption" that disappears in the face of evidence. *Rossetto*, 217 F.3d at 543 (citing *Bidlack*, 993 F.2d at 607, 609).

### B.

As Judge Posner remarked in *Rossetto*, the presumption against vesting is defeated by "any positive indication of ambiguity, something to make you scratch your head." 217 F.3d at 544. The language contained in the plan documents before us certainly makes us scratch our heads.

"Lifetime" language is found in three plan documents. Thus, the "Benefit for Retired Salaried Employees Plan"

document covering retired salaried employees who retired after Dec. 31, 1976, provides that health insurance and dental ". . . coverage remains in effect as long as you or your surviving spouse are living." In addition, the "Health Benefits Plan" and "Benefits for Retired Hourly Employees Plan" documents distributed to hourly employees at FANA's Carol Stream and Deerfield plants state that "[i]f a retired employee dies, the surviving spouse will have basic coverage continued for his or her lifetime at no cost." Finally, the "Benefit Fact Sheets" provided to salaried employees affected by shutdown of FANA's Springfield plant state that employees would have "the retired employee benefits in effect prior to March 1, 1985," which plaintiffs contend were those established in the "Benefit for Retired Salaried Employees Plan," noted above.

But other language in the plan documents is comparatively weak. The January 1978 "Group Health Plan for Active Salaried Employees" document simply assures active salaried employees that "benefits continue to be paid for by the company," and that spouses and dependents "can continue the protection." And the two plan documents directed to hourly employees merely state that "benefits are provided" for retirees. Significantly, there is no express reservation of rights clause in any of the plan documents.

To further complicate the matter, the question arises whether the "Benefits for Retired Salaried Employees Plan" document may be applied to employees who retired after the "Group Health Plan for Active Salaried Employees" was established. The district court found that the "Benefits for Retired Salaried Employees" Plan governed only the claims of salaried employees who retired in 1977 and later stated that this plan was replaced in January of 1978 by the "Group Health Plan for Active Salaried Employees." The district court also concluded with respect to the 1985 "Benefit Fact Sheets" that they referenced only the January 1978 "Group Health Plan For Active Salaried Employees," and

not the "Benefits for Retired Salaried Employees Plan" of 1976 vintage. We are doubtful, however, that such conclusions can be reached on summary judgment.

Whatever plans were in effect at any given time, the "lifetime" language in the plan documents leads us to conclude that they are not silent as to vesting, but merely somewhat vague; however, they are clear enough to vitiate the presumption against vesting. The absence of a reservation of rights clause distinguishes this case from *Vallone*, and the "lifetime" language used in the plan documents is stronger and more explicit than language in comparable cases. *See Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992) (holding that language stating welfare benefits "will continue" did not create ambiguity as to vesting). *See also Skinner Engine Co.*, 188 F.3d at 141, 143 (holding that plan language stating that health benefits "will continue" and life insurance "shall remain" at the same level did not unambiguously express an intent to vest benefits for life because there was no durational language, and the language was not ambiguous because it merely indicated a continuation of prior practice and policies). And the language before us is either similar to or more explicit than language that we and other courts have found to be at least ambiguous with respect to vesting. *See Rossetto*, 217 F.3d at 546 (finding latent ambiguity in collective bargaining agreements conferring benefits upon retirees consisting either of medigap insurance or in line with the coverage given to active employees and stating that benefits would continue for retirees' dependents until the sixth month after the retirees' death); *Diehl*, 102 F.3d at 306 (holding that a separate agreement containing "lifetime" benefits language stating that retirees would be "entitled [to health benefits] for the lifetime of the petitioner" modified a reservation of rights clause incorporated from another agreement and that retirees were thus entitled to welfare benefits for their lifetimes); *Bidlack*, 993 F.2d at 606 (construing as ambigu-

ous collective bargaining agreement language providing that retired employees "will have the full cost" of health insurance coverage "paid by the Company" after age 65 and that benefits "shall be continued" for spouses after the retirees' deaths, and finding ambiguity in plan language stating that retirees and spouses "will be covered for the remainder of your lives" at no cost); *Int'l Assoc. of Machinists and Aerospace Workers, Woodworkers Division, AFL-CIO v. Masonite*, 122 F.3d 228, 233 (5th Cir. 1997) (construing as ambiguous language incorporated into collective bargaining agreement stating that retirees were entitled to comprehensive medical benefits "until the death of the retired employee"); *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) (construing as ambiguous the statement that the "Company will provide insurance benefits equal to the active group benefits for retirees and their spouses"). *Diehl* goes so far as to intimate that "lifetime" language may be *unambiguous*, since such language "stands apart from language we have considered in similar cases in recent years" in which "we are more commonly asked to find an intent to create lifetime entitlements despite terms that are ambiguous or completely silent on the issue." 102 F.2d at 306.

Further, in the absence of a reservation of rights clause, we are convinced (not surprisingly) that in the case before us "lifetime" is durational, meaning "for life." In *Vallone*, we acknowledged alternatively that "lifetime" in the context of "lifetime benefits" could be construed as "good for life unless revoked or modified." 375 F.3d at 633. However, we also noted that this construction of "lifetime" was most plausible if the plan documents included a reservation of rights clause, as was the case in *Vallone*. *Id.* This is because the presence of a reservation of rights clause fundamentally alters the interpretation of "lifetime" language; both the clause and the "lifetime" language must be read together, creating a tension that is best relieved by finding that retirees are entitled to benefits for life, but that this entitlement is subject to change

at the employer's will. *See UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704 (7th Cir. 2003) ("We must resolve the tension between the lifetime benefits clause, and the plan termination and reservation of rights clauses, by giving meaning to all of them. Reading the document in its entirety, the clauses explain that although the plan . . . entitles retirees to health coverage for the duration of their lives . . . the terms of the plan— including the plan's continued existence—are subject to change at the will of" the employer). In the absence of a reservation of rights clause, interpreting "lifetime" as being limited by the employer's continuing willingness to provide benefits is unreasonable. In fact, *Vallone* appears to limit the interpretation of "lifetime" as "lifetime subject to change" to cases in which there is a reservation of rights clause. *Id.* at 634 (stating that "the 'lifetime' nature of a welfare benefit does not operate to vest that benefit *if the employer reserved the right to amend or terminate the benefit.*") (emphasis added).

We thus hold that, under *Vallone* and its antecedents, the presence of "lifetime" language in several of the FANA plan documents—language uncontradicted by the agreement read in its entirety—defeats summary judgment. *Vallone*, 375 F.3d at 637 (quoting *Rossetto*, 217 F.3d at 547) ("If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial."). This holding is consonant with the decisions of other circuits. *See Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 98 (2d Cir. 2001) (reversing grant of summary judgment to defendant plan and holding that, in the absence of reservation of rights clause, "lifetime" life insurance benefits in early retirement plans were "ambiguous and susceptible to interpretation as a promise of vested benefits"); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 85 (2d. Cir. 2001) (stating that, where there was no reservation of rights clause, "'lifetime' lan-

guage . . . is sufficient to created a triable issue of fact as to whether Empire promised to vest retiree life insurance benefits at the stated level."). On remand, if the judge or jury concludes that the ambiguous language establishes vesting, the decisionmaker must also determine whether *all* retiree benefits have vested, or if only certain groups of plaintiffs enjoy vested benefits.

## III.

In holding that the language of several of the plan documents is ambiguous as to vesting, of course we open the door to consideration of extrinsic evidence. However, considerations of privilege may not allow that door to open very far, since the opening may be constrained by the magistrate judge's conclusion that most of the documents to which plaintiffs seek to gain access are protected by the attorney-client and/or work-product privileges.

## A.

The appropriate standard of review of a district court's findings of fact regarding claims of attorney-client privilege is the clearly erroneous standard. *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). On appeal, the plaintiffs seek to undermine the claims of attorney-client privilege by relying on two exceptions to that privilege doctrine. The plaintiffs first argue that they should be permitted access to the privileged documents under the breach of fiduciary duty exception. Under that exception, a fiduciary of an ERISA plan "must make available to the beneficiary, upon request, any communications with an attorney that are intended to assist in the administration of the plan." *In re Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997). This exception is premised on the theory that the attorney-client privilege should not be used as a shield to prevent

disclosure of information relevant to an alleged breach of fiduciary duty. *Harper-Wyman Co. v. Conn. Gen. Life Ins. Co.*, 1991 WL 62510 (N.D. Ill. April 17, 1991).

The magistrate judge determined that the fiduciary exception was not available here since the amendment or termination of plan benefits is not a fiduciary action. Initially, it is questionable whether the fiduciary exception is even applicable, since the plaintiffs voluntarily dismissed their breach of fiduciary duty claim with prejudice, and thus should perhaps not get the benefit of the exception. In any event, we cannot find that the magistrate judge erred in concluding that an employer acts as a fiduciary only when it undertakes plan management or administration. An employer acts in a dual capacity as both the manager of its business and as a fiduciary with respect to unaccrued welfare benefits, is free to alter or eliminate such benefits without considering employees' interests and does not owe its employees a fiduciary duty when it amends or abolishes unaccrued benefits. *Young v. Standard Oil, Inc.*, 849 F.2d 1039, 1045 (7th Cir. 1988). Decisions relating to the plan's amendment or termination are not fiduciary decisions. *See Hughes Aircraft Co. v. Jacobsen*, 525 U.S. 432, 443-44 (1999) (stating that since "employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans," "[w]hen employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust.") (quotation marks and citations omitted); *In re Long Island Lighting Co.*, 129 F.3d at 272. Plan management, after all, consists of such activities as "investment of pension funds and communications to employees about plan administration." *King v. National Human Resource Committee*, 218 F.3d 719, 724 (7th Cir. 2000). In addition, we have previously held that amending plan benefits, such as by spinning off plan assets to a new plan, does not implicate fiduciary responsibilities. *Id.*

## B.

The plaintiffs also seek to obviate the work-product doctrine through two exceptions: a "crime/fraud" exception and an "extraordinary need" exception. The magistrate judge stated that the plaintiffs had dropped the crime/fraud exception in their sur-reply, and so did not address that argument. For this reason, we deem this argument waived.

The plaintiffs also assert that they have a substantial need for the documents protected as work-product, claiming that these documents prove that FANA knew its medical benefits were vested as of 1984, and that the plaintiffs would encounter substantial hardship in obtaining the material through alternative means under Fed. R. Civ. P. 26(b)(3). *See Hickman v. Taylor*, 329 U.S. 495 (1947). The magistrate judge has not yet addressed these issues. We are not unsympathetic to these concerns, and would ask the district court to carefully consider them.

## IV.

We therefore hold that the "lifetime" language in several of the FANA plan documents is at least ambiguous as to whether some or all of the retiree benefits are vested. Here, there is no reservation of rights clause to constrain the interpretation of explicit "lifetime" language. If any retiree benefits are in fact vested, then additional determinations will have to be made with respect to which benefits are vested, or whether the 2001 modifications to retiree benefits effectively cut off retirees' rights. Accordingly, we REVERSE the grant of summary judgment to the defendant and REMAND this case for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*