In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1558

JOHN SULLIVAN, *et al.*, individually
and as representatives of a class,

*Plaintiffs-Appellants*,

*v.*

CUNA MUTUAL INSURANCE SOCIETY and
CUNA MUTUAL GROUP MEDICAL CARE
PLAN FOR RETIREES,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 09-cv-455-vis—**Barbara B. Crabb**, *Judge*.

ARGUED OCTOBER 21, 2010—DECIDED AUGUST 10, 2011

Before EASTERBROOK, *Chief Judge*, and MANION and
HAMILTON, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. CUNA Mutual Insurance
Society maintains a health-care plan for the benefit of its
retirees. Beginning in 1982 it gave retirees credit toward
their share of the cost, if they had unused sick-leave

balances. CUNA Mutual calculated how much each person's unused sick-leave days would be worth at that person's daily wage. Workers covered by a collective-bargaining agreement could choose between taking that sum in cash or putting it toward the retiree's premium. Management employees did not have that option. Executives who quit before retirement age, or who decided not to participate in the health plan, did not receive payment or any other form of compensation for unused sick leave. It had value only as a credit toward health-care costs during retirement.

Here is a simple example. An executive retires with unused sick leave valued at $50,000. CUNA Mutual contributes half of the $10,000 annual cost of health care; the employee is responsible for the rest. For 10 years, the employee's portion is met by drawing down the sick-leave balance at a rate of $5,000 a year. Effectively CUNA Mutual covers 100% of the medical-care costs for a decade. Beginning in year 11, the retiree must pay $5,000 a year as his share of the health-care plan, and CUNA Mutual contributes the other $5,000.

Things changed at the end of 2008. CUNA Mutual amended the Plan and stopped paying any part of retirees' health-care costs. This meant not only the end of CUNA Mutual's explicit payment, but also the end of retirees' ability to use their sick-leave balances to cover their portion, with one exception: Employees who could have taken their sick-leave balances in cash are treated as having done so and then invested that money in an account to be administered by the health-care plan. Thus

retirees who formerly worked under a collective-bar-gaining agreement continue to have the benefit of their sick-leave balances. But after the 2008 change these balances are used to pay 100% of the cost (until each account is exhausted), rather than 50% or whatever other sharing ratio was in place when the person retired.

A class of retirees filed this suit under the Employee Retirement and Income Security Act. The class representatives are four retired executives who never had an option to take their sick-leave balances in cash, plus one retiree who had that option but elected to leave the money on deposit. The district court granted judgment on the pleadings to CUNA Mutual and its Plan. 683 F. Supp. 2d 918 (W.D. Wis. 2010).

Health care is a welfare-benefit plan under ERISA. The statute recognizes two principal differences between pension plans and welfare-benefit plans. First, although pension plans must be funded, with assets held in trust, welfare-benefit plans need not be funded. See 29 U.S.C. §1081(1) (exempting welfare-benefit plans from the funding requirements in §1083). CUNA Mutual operates its Plan on a pay-as-you-go basis; general corporate revenues support all health-care benefits. Second, although pension benefits vest, welfare benefits do not. Employers are free to reduce or abolish benefits under welfare plans. See 29 U.S.C. §1051(1) (exempting welfare-benefit plans from the vesting rules in §§ 1052–61). Employers nonetheless may create vested welfare benefits by contract. See, e.g., *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir. 1993) (en banc);

*Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632 (7th Cir. 2004). CUNA Mutual's health-care plan does not promise vested benefits, and each version has contained a clause reserving its right to modify or eliminate the benefit. For example, the 1995 version of the Plan provides: "The Employer expects the Plan to be permanent, but since future conditions affecting the employer cannot be anticipated or foreseen, the Employer must necessarily and does hereby reserve the rights to amend, modify or terminate the Plan . . . at any time by action of its Board." Language of this kind permits amendments. See *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995).

One more legal proposition sets the stage for this appeal. The fiduciary duties created by ERISA are limited to the administration of a plan. When deciding what benefits to include in a plan, an employer is free to prefer its own interest (and that of its investors) over the interests of employees and retirees. See *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999); *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996). CUNA Mutual therefore was entitled to cut back on health benefits even though this dashed retirees' expectations. But it still had to comply with any specific requirements in ERISA and the Plan's organic documents.

The retirees' principal argument is that CUNA Mutual violated 29 U.S.C. §1106(a)(1)(D) by diverting plan assets to itself. This subsection prohibits any "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan". An employer is a statutory "party in interest". 29 U.S.C. §1002(14)(C).

According to the retirees, sick-leave balances are assets of the Plan, assets that CUNA Mutual appropriated. They observe that, when CUNA Mutual amended the Plan, its balance sheet reflected a gain of more than $120 million. This must be the value of the seized assets, the retirees believe.

Plaintiffs misunderstand the nature of the sick-leave balances and the reasons why CUNA Mutual revised its accounting treatment. The sick-leave accounts of former managers don't contain money and never did. They were not assets of the Plan, which always has been financed by cash from both retirees and CUNA Mutual. Far from being assets, these balances were liabilities: they represented amounts that CUNA Mutual had agreed to contribute to the Plan in lieu of cash from retirees. Any given retiree might have deemed the balance a personal asset, in the sense that it represented CUNA Mutual's promise not to ask the retiree to pay for health care until the balance had been exhausted. But §1106(a)(1)(D) deals with assets *of the Plan*, not with employers' unfunded promises.

Because CUNA Mutual had pledged to pay part of all retirees' health costs (and all of each employee's costs, until the sick-leave balance reached zero), it had to carry this obligation as a liability on its books. Accounting conventions require employers to capitalize the value of future contributions. This is where the $120 million figure came from: CUNA Mutual estimated the amount it would need to pay each year (an amount that included the sick-leave balances, which represented

payments that CUNA Mutual made before calling on retirees to chip in their own money) and then discounted this stream of payments to present value. The total was a little more than $120 million, reflected as a liability on the firm's balance sheet. When CUNA Mutual amended the Plan in 2008 so that it no longer paid for retirees' health care, it removed this debit. The result was a one-time gain. Yet no assets changed hands; CUNA Mutual did not take anything out of the Plan. It simply reduced the amount it would pay in. Section 1106(a)(1)(D) has not been violated.

As the retirees see things, if the sick-leave balances were not "assets of the plan", then they must be outside of ERISA and governed by state law. See *Massachusetts v. Morash*, 490 U.S. 107 (1989); see also 29 C.F.R. §2510.3–1(b)(2) (defining those fringe benefits that are not treated as ERISA plans). As the district court observed, however, this part of the retirees' argument has the same flaw as the reliance on §1106(a)(1)(D). It conceives of the sick-leave balances as an asset that the employer has appropriated. In *Morash* the Court held that an employer's vacation leave system, which provided that unused time would be compensated as days worked, was not a welfare-benefit plan under 29 U.S.C. §1002(3). This meant that ERISA did not preempt state law, which required employers to keep their promises about employees' compensation. CUNA Mutual, by contrast, never promised managerial workers that it would pay them for unused sick days. The question in this litigation is not what value unused sick leave had outside an ERISA plan but what value it has

within this Plan—which is a welfare-benefit plan under §1002(3). State law does not affect whether an ERISA plan must allow retirees to treat unused sick leave as a substitute for money.

This leaves the retirees' argument that the Plan itself created vested rights. The problem with this argument is that every version of the Plan reserved the right to change required contributions or even eliminate health-care benefits. CUNA Mutual never told its workers that rights were "vested" or would continue for their "lifetime." Not that "lifetime" is a magic word; as we observed in *Vallone*, " 'lifetime' may be construed as 'good for life unless revoked or modified.' " 375 F.3d at 633. What such a word means depends on context—including the context provided by language expressly reserving the right to change or eliminate benefits, language that CUNA Mutual's Plan shares with the plan at issue in *Vallone*.

Instead of contending that they had been assured that health benefits were vested (or any equivalent), the retirees try to flip the burden. They observe that many documents handed out by CUNA Mutual—including the forms that they signed when enrolling in the Plan—did not contain a reservation of rights to change the Plan. That omission could matter if an employer must show, not only that the right to amend had been reserved, but also that this reservation was known to all workers. That is not, however, an employer's burden. To establish that rights have vested as a matter of contract, the plan participant must demonstrate that the employer tied

its own hands. The absence from any given communication of language reserving a right to amend a plan is some distance from the presence of language negating that entitlement. Silence is just that—silence. Participants need more than silence to establish vested rights to lifetime benefits. So we held in *Bidlack*, *Vallone*, and many other decisions, including *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir. 2006), and *United Auto Workers v. Rockford Powertrain, Inc.*, 350 F.3d 698 (7th Cir. 2003).

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), holds that silence in a summary plan description about some feature of a pension plan does not override language in the plan itself. The Justices observed that it is essential to a "summary" plan description that things be left out; a summary plan description covering every feature of a plan would not be a "summary." Moreover, the Court held, even if a summary plan description contradicts the full plan, the terms of the full plan continue to govern participants' entitlements. ERISA directs judges to enforce the terms of a plan; it does not authorize judges to change those terms. 29 U.S.C. §1132(a)(1). See 131 S. Ct. at 1876–80. A participant who draws an unfounded inference from an omission from a summary plan description is not entitled to a remedy. And if this is true about gaps in a summary plan description—a document that ERISA itself requires plan sponsors to give to all participants, see 29 U.S.C. §1022(a)—then silence in an election form cannot override the terms of a plan.

Just as it would be a mistake for an employer to lard a summary plan description with the complexities of a full

plan, it would be a blunder to add pages of caveats and reservations to an election form, which is supposed to be simple. People who want more details can look to other documents. It takes time to read and understand extra information, and the addition of hard-to-digest notices can lead to errors by masking the nature of the choice that a participant needs to make. Employers that want to help their workers make intelligent retirement decisions should pare down forms so that they focus on what matters most. See Omri Ben-Shahar & Carl E. Schneider, *The Failure of Mandated Disclosure*, 159 U. Pa. L. Rev. 647 (2011). See also *Todd v. Société BIC, S.A.*, 9 F.3d 1216, 1218–19 (7th Cir. 1993) (en banc); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 869–70 (7th Cir. 2010). Cf. Jerry Avorn & William Shrank, *Highlights and a Hidden Hazard—The FDA's New Labeling Regulations*, 354 N.E. J. Medicine 2409 (2006). Our retirees do not say that they were misled by the election forms; they would have opted into the Plan no matter what the forms said. (To repeat for the last time: There was nothing else the executives could have done with the unused sick-leave balances, and the union workers, who had a choice to cash out, are receiving full credit for those balances, just as if they were funds on deposit.)

The retirees had an expectation, to be sure: Many a day they may have struggled in to work, despite ailments that could have justified taking time off, in order to preserve their sick-leave balances and thus earn credit toward medical care in retirement. But although expectation interests may lead employers to refrain from reducing retirees' benefits—employees would be more

likely to call in sick, or demand higher wages or vested pension benefits, if arrangements such as CUNA Mutual's pre-2008 policy prove to be unstable—equitable considerations do not reduce employers' legal entitlement to change welfare-benefit plans. *Hughes Aircraft* and *Lockheed* hold that employers are entitled to disregard employees' interests when amending ERISA plans. If silence in election forms and summary plan descriptions cannot override the express terms of the formal plan, silence in the long years *before* retirement (the decades when employees had to decide 200 days a year whether to work or call in sick) cannot override a plan's express terms.

Reliance interests are universal. The terms of the pension or welfare plan in force when a given worker is 30, 40, or 50 affect how much that worker saves privately and how long the person continues to work. Yet those interests do not prevent employers from changing their plans once the worker reaches 60, 70, or 80. ERISA forbids any reduction in vested pension benefits but gives employers discretion over other benefits. If reliance interests block a reduction in welfare benefits, then the distinction between pension and welfare plans would be abolished, and *Hughes Aircraft* and *Lockheed* would be effectively reversed.

CUNA Mutual reserved the right to amend its healthcare plan. It is a business decision, not a legal question, whether to use that authority to retirees' detriment.

AFFIRMED

HAMILTON, *Circuit Judge*, dissenting in part. I respect-fully dissent from the portion of the decision affirming dismissal of plaintiffs' claims based on the cancellation of their unused sick leave accounts. Relying on CUNA Mutual's reservation of the right to amend or terminate its benefit plan, my colleagues have come to a decision in this case that is not inconsistent with precedent. The decision, however, is not compelled by precedent. We can and should reconcile conflicting plan provisions without giving absolute trumps to the employer's reserva-tion of a right to amend or terminate the plan. Nothing in the statute itself or in the Supreme Court's interpreta-tions of it prevents us from interpreting ERISA in a way that stays closer to its purposes and protects the legitimate reliance interests of the employee-plaintiffs in this case.

The relevant facts alleged here are not complex. As part of an overall compensation package offered to persuade employees to continue to work, and to work hard, CUNA Mutual promised in 1982 that retiring employees could take the value of unused sick leave over the course of their careers and use that value to pay the employees' shares of retiree health benefits. This was a valuable promise, or at least it appeared to be a valuable promise. CUNA Mutual kept track of unused sick leave. By late 2008, the company's promised contributions to retirees' health insurance costs based on individual sick-leave credits for non-union employees and accrued promises to subsidize retirees' health care added up to more than $121 million.

But 2008 was a tough year for many insurance companies like CUNA Mutual. CUNA Mutual looked for ways to improve its balance sheet. One bright idea was simply to cancel the promise, to wipe away the $121 million liability, and thus to add $121 million to the bottom-line equity of the company, all with just an easy stroke of a pen. The idea was too attractive to pass up. CUNA Mutual's board decided to renege on the $121 million promise and the company pocketed the take. As Woody Guthrie sang: "Some will rob you with a six-gun/And some with a fountain pen."[1]

Apart from judicial interpretations of ERISA — a law enacted to protect employee benefits — this would present a straightforward claim for promissory estoppel or breach of a unilateral contract. CUNA Mutual made a promise to its employees. That promise was intended to induce those employees to rely upon it. Many in fact reasonably relied upon that promise, some for more than a quarter-century. The reliance is easy to understand for anyone who has ever woken up feeling a little under the weather but wanted to save sick leave for times when it would really be needed. When the promise was broken, those employees were harmed. A state court could craft a suitable remedy for those injured employees. *Schlosser v. Allis-Chalmers Corp.*, 271 N.W.2d 879, 889 (Wis. 1978) (pre-ERISA case affirming summary judgment for plaintiff class after employer

---

[1] "Pretty Boy Floyd," as reprinted in Woody Guthrie, American Folksong, New York (1961).

unilaterally modified retiree life insurance benefits to detriment of retirees; employer's reserved power to amend plan could not be exercised to deprive retirees of rights after they had fully performed their services); see also *Cantor v. Berkshire Life Ins. Co.*, 171 N.E.2d 518, 522 (Ohio 1960) (finding that employee's rights in pre-ERISA retirement plan became vested once the employee had complied with conditions entitling him to participate in plan even where employer had reserved right to amend or terminate the plan); Restatement (Second) of Contracts § 90 ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.").

I agree with my colleagues, however, that ERISA requires us to treat any state law claim as preempted. The unused sick leave of the non-union employees here was not treated as a regular payroll practice that could be exempt from ERISA under *Massachusetts v. Morash*, 490 U.S. 107 (1989), but was instead used to pay for retiree health insurance, an employee welfare benefit plan under ERISA. The unused sick leave could benefit employees only if they stayed at CUNA Mutual until retirement, and the unused sick leave was never available to the non-union employees in the form of cash.

In light of ERISA preemption, the controlling issue here is whether ERISA defeats such a theory of promissory estoppel under federal law. It is worth recalling here

that ERISA was enacted to protect employees from em-
ployers who mismanaged or even looted funds set aside
to provide employee benefits — both pension plans and
welfare plans. See, *e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463
U.S. 85, 90 (1983). Promissory estoppel is part of the
common law we apply in interpreting ERISA. *E.g.*, *Miller
v. Taylor Insulation Co.*, 39 F.3d 755, 758-59 (7th Cir. 1994).
Yet in this case, the company is using ERISA as a shield
to deny these employees any remedy for the broken
$121 million promise.

At least with respect to dismissal of claims based on
cancellation of the unused sick leave credits, this result
is not mandated by the language of ERISA or by the
decisions of the Supreme Court interpreting the law,
nor, in my view, by circuit precedent. To the extent this
result might be deemed mandated by prior decisions
of this court giving trumps to reservation-of-rights
clauses in welfare benefit plans, we should be willing
to reconsider those decisions.

In similar cases in which employers have reneged on
promised welfare benefits that employees have relied
upon, the opinions of this court and of district courts
applying our decisions often express sympathy for
the poor, benighted employees who simply were not
sophisticated enough to understand how their em-
ployers could take away the promised welfare benefits.
For example, when employees accepted an early retire-
ment package that promised "lifetime" health insur-
ance, we affirmed summary judgment for the em-
ployer that cancelled the "lifetime" benefits, but wrote:

"As laypersons, the plaintiffs' confusion on this issue is understandable; it is also very unfortunate, if it was a basis for their accepting the [early retirement] package. But in the perhaps beady eyes of the law, the 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit. . . ." *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 634 (7th Cir. 2004). In *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir. 2006), we affirmed summary judgment for an employer who terminated "lifetime" health insurance benefits. We blamed the union for the plaintiffs' failure to understand why the promise was deemed worthless: "The distinction between lifetime benefits and vested benefits is 'a legal distinction that understandably escaped' many of the retirees. 'It is difficult to imagine that someone without legal training would be able to fully comprehend a reservation of rights clause and how a court would interpret such a clause.'" *Id.* at 486 (citations omitted). We see similar regret from the district court in this case against CUNA Mutual: "It is understandable that plan participants might have been confused about the duration of welfare benefits. What seemed to them to be lifetime benefits turned out to be something else altogether, because of the reservation of rights clause in the plan. No doubt plaintiffs feel cheated by the loss of the benefits they anticipated. However, neither the understandable nor unfortunate nature of the circumstances changes the result of this case." *Sullivan v. Cuna Mutual Ins. Society*, 683 F. Supp. 2d 918, 935 (W.D. Wis. 2010). Many other cases could be cited with similar expressions of sympathy and regret.

When federal judges repeatedly confront and express regret about these "understandable" problems when employers renege on their promises with impunity, after the employees have performed their parts of the bargain and are relying on the employers to perform their parts, I respectfully suggest that we should reconsider the course we are navigating. We should ask whether higher authority requires us to follow it.

The majority correctly points out that ERISA does not require that welfare benefit plans provide vested benefits, see 29 U.S.C. § 1051(1), but that employers may create vested welfare benefits by contract. See *supra* at 3-4, citing *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 605 (7th Cir. 1993) (en banc), and *Vallone*, 375 F.3d at 632. Did the documents here provide for vested benefits? The majority says no, relying on the reservation-of-rights clauses. As an example, the 1995 version of the plan provides: "The Employer expects the Plan to be permanent, but since future conditions affecting the employer cannot be anticipated or foreseen, the Employer must necessarily and does hereby reserve the right to amend, modify or terminate the plan . . . at any time by action of its Board."

It is common to say that such reservation-of-rights clauses absolutely trump explicit promises that seem to conflict with them, as in *Vallone*. There we held that a reservation-of-rights clause trumped the promise of "lifetime" health benefits in an early-retirement package (where reliance would be very strong). 375 F.3d at 634. Accord, *e.g.*, *UAW v. Rockford Powertrain, Inc.*, 350 F.3d

698, 703 (7th Cir. 2003) (explaining that "although the plan in its current iteration entitles retirees to health coverage for the duration of their lives and the lives of their eligible surviving spouses, the terms of the plan—including the plan's continued existence—are subject to change at the will of [the employer]" where there is a reservation of rights clause), cited in *Vallone*, 375 F.3d at 633; *In re Unisys Corp. Retiree Medical Benefit ERISA Litig.*, 58 F.3d 896, 904 (3d Cir. 1995). Under that approach, the reservation-of-rights clause renders all promises of future benefits essentially illusory, as if they were written with disappearing ink. It's just the tough luck of the employees who do not understand the meaning of the reservation-of-rights clauses.

There is a better approach available here, based on both the plan documents and the nature of the promised benefits. Vesting need not be an all-or-nothing proposition, but may allow a district court to craft an appropriate equitable remedy under a theory of promissory estoppel based on detrimental reliance. We should start by recognizing that the relevant documents must be read together and construed as a whole. *Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). Vesting requires "clear and express" language, but it need not use the word "vest" or a variant of it. *Id.* at 784. Perhaps most important, plan language should be read "'in an ordinary and popular sense,' construed as if by a 'person of average intelligence and experience.'" *Id.*, quoting *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998). That's a lesson we should keep in mind when we keep expressing regret for the poor employees who

did not understand that the company was retaining an absolute right to renege even after the employees performed.

Where "potentially conflicting provisions coexist" within a document or a contract made up of several documents, "the rule that contractual provisions be read as parts of an integrated whole will lead a court to seek an interpretation that reconciles those provisions." *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 307 (7th Cir. 1996). While, as this court decided in *Bidlack*, there is a "presumption" that an employee's entitlement to welfare benefits "expires with the agreement creating the entitlement, rather than vesting, . . . the presumption can be knocked out by a showing of genuine ambiguity, either patent or latent, beyond silence." *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 543 (7th Cir. 2000), citing *Bidlack*, 993 F.2d at 606-07 (opinion of Posner, J.). Where there is ambiguity or vagueness or some "yawning void . . . that cries out for an implied term" in the contract, courts may look to extrinsic evidence to determine if employees have an entitlement to benefits. *Bidlack*, 993 F.2d at 608 (opinion of Posner, J.); see also *id.* at 607 (explaining that courts interpolate contract clauses based on the structure of the contract where it is "unlikely that the parties had intended so one-sided a deal.").

The plan documents here include not only the reservation-of-rights clauses, but also the election forms that most of the plaintiffs signed. In 2001, for example, plaintiff Olson signed a form accepting the following statement: "I elect the CUNA Mutual Group Health

coverage by paying 60% of the monthly premium (CUNA Mutual pays 40%). My 60% monthly contribution will be deducted from my estimated sick leave dollar balance, $145,443.08 *until it is exhausted*. After that time, my premiums will be deducted from my monthly Pension check if I wish to continue coverage." SA 71 (emphasis added). Plaintiff Specht signed an essentially identical form. SA 72. Plaintiff Sullivan signed an earlier form that said: "Effective July 1, 1996, the premium *will be paid from the sick-leave dollar value* calculated at retirement in accordance with the administrative ruling dated July 9, 1982." SA 70 (emphasis added).

In my view, all of this language, and especially the "until it is exhausted" phrase, clearly implies a promise not to use the reservation-of-rights clause to wipe out the value of the retiring employee's performance — in the form of declining to use sick leave — but to use the value of that performance for the benefit of the retiree. Keeping in mind that this case comes to us on bare pleadings from a Rule 12(b)(6) dismissal, we must assume that is how these plaintiffs understood the relevant language from all the documents. That is what the district judge thought: "It is understandable that plan participants might have been confused about the duration of welfare benefits." 683 F. Supp. 2d at 935.

In deciding how to reconcile the documents, we need not decide at this point whether resort to parol evidence is permissible, cf. *Bidlack*, 993 F.2d 603, but we can and should pay particular attention to the structure and incentives of the employer's promise of benefits to em-

ployees. It is certainly possible to "reconcile" the conflicting provisions as the majority does, by saying simply that the reservation of rights clause trumps everything else. But a better solution, and one that is probably more consistent with the expectations of all interested parties, is to find a middle ground, a solution more consistent with all of the plan language and based on the structure of the promise and the parties' performance of it. This was not a one-sided or charitable promise by the employer. The bargain was clear. The employees provided their performance over the course of their careers by refraining from taking the sick leave that was part of their compensation. The employer kept track of their individual performance, and it gave them credit for that performance at the time of retirement by paying the entire premium for retiree health benefits until the individual employee's sick leave dollar balance was exhausted. The tracking of individual contributions to these virtual accounts makes the attempted use of the reservation-of-rights clause even more misleading and deceptive, and can distinguish this case from cases with more generic promises of future benefits, if such a distinction is needed.

Under this approach, the reservation-of-rights clauses can be interpreted as leaving the employer free to terminate the plan entirely, to eliminate the employer contribution entirely, to stop crediting any new amounts for unused sick leave, or to modify the scope of the insurance coverage or many other terms of the plan. The potential need for such changes is understandable. Times change. Competitive pressures increase. But such general

language reserving the right to amend or terminate for such legitimate reasons should not and need not be interpreted to allow the employer to wipe out the value of those virtual individual account balances built up over years, rendering the promise illusory after the other party has performed. Under the approach I suggest, a district court could exercise its equitable discretion to craft a remedy to require that individual retirees receive in some form the benefit of their performance over the years. District courts have such equitable discretion in crafting remedies under promissory estoppel generally, and under ERISA in particular. If the employer chooses to terminate the unused sick leave program, or perhaps even all retiree health insurance, that could be permissible so long as a remedy was provided to the individual retirees. But having made the promise it made, and having benefitted from the employees' performance for many years, the employer should not be permitted to use the reservation-of-rights clause to walk away from its promise and to keep the entire value of the employees' performance made in reliance on that promise.

This middle-ground approach can be criticized as giving insufficient weight to the reservation-of-rights clauses. It can also be criticized as giving too much weight to those same clauses. To the extent this approach can be criticized as inconsistent with some of our cases, I respectfully suggest that we reconsider our approach to these problems. We should show a greater willingness to pursue ERISA's fundamental purposes of protecting employee benefits from abusive practices of

employers and to use the equitable doctrine of promissory estoppel when its elements are proven.

Several legally sound routes are available, consistent with the statute and Supreme Court precedents. One route would be adoption of what Judge Cudahy called the "weak vest rule" in his opinion for three judges in *Bidlack*. 993 F.2d at 610-14. Another would be to recognize how misleading plan documents and communications with employees have actually been when plans attempt to use broad reservation-of-rights clauses to defeat such reasonable expectations of employee-beneficiaries. See, *e.g.*, *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448-56 (6th Cir. 2002); *In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 579 F.3d 220, 227-34 (3d Cir. 2009). Federal courts have often recognized that ERISA imposes duties on fiduciaries not to mislead a plan participant. ERISA's fiduciary duties are implicated here because the duty not to mislead applies when the fiduciary should know that the participant is laboring under a material misunderstanding of plan terms and benefits. *E.g.*, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466-71 (7th Cir. 2010) (collecting cases). In cases like this one, I submit, the plan fiduciaries should know very well that plan participants were (literally) laboring based on material misunderstandings of plan benefits.[2]

---

[2] In the *Unisys* case, the Third Circuit rejected an argument by the employer that was simply jaw-dropping: that a

(continued...)

Employers and courts ruling in their favor often justify decisions to defeat employees' expectations by pointing out that ERISA does not require employers to establish any benefit plans at all. That is true. See, *e.g.*, *Conkright v. Frommert*, 130 S. Ct. 1640, 1648 (2010) ("Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place"); *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (courts must accommodate Congress' desire "not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place"). That's why courts should try to interpret ERISA in a consistent and predictable manner, so that all parties to ERISA plans know what to expect. See *Conkright*, 130 S. Ct. at 1648-49. But our protection of employers need not and should not extend to the point that we bless institutionalized deception and defeat the reasonable expectations and reliance interests of employees. Those employees cannot reasonably be expected to figure out

---

[2] (...continued)

reservation-of-rights clause was not "material" to plan participants because the employer was not considering any changes to the plan at the time the plan was described to employees. 579 F.3d at 233. Such reservation-of-rights clauses are certainly material to employers seeking to avoid their promises. They should be deemed equally material to employees who "needed to know in order to protect themselves from potential harm." *Id*.

that a reservation-of-rights clause tucked into the plan's fine print means the employer's fingers are crossed and the promise can be erased at the stroke of a pen. We should reverse the dismissal of the claims based on the unused sick leave accounts and remand to the district court for further proceedings, including a ruling on class certification.

CUNA Mutual's unionized employees negotiated for and received a promise that, upon retirement, they could choose between either a cash pay-out for unused sick leave or use of their unused sick leave to pay for health insurance. They were protected from the loss of their unused sick leave. The non-union employees in our case received no such option and no such protection. Their mistake was believing their employer's promise. The lower federal courts are unlikely to change course on our own. Unless and until either the Supreme Court or Congress acts, the lesson for other employees from this case and the other cases of broken promises to retirees is clear: an employer's reservation of rights usually means that its promises are written in disappearing ink. Employees should give no weight to such promises in deciding whether to stick with their jobs (or whether to call in sick, in this case). They should seek either cash, a good union contract, or vested pension benefits instead of illusory promises.